GORDON M. SKEOCH, Appellant

v.

EARLE B. OTTLEY, MARIO DE CHABERT, PATRICK WILLIAMS, FAY TRUITT, WARREN BROWN, RANDALL JAMES, JAMES BROOKS, ERIC CARROLL, HENRICK McALPIN, LEROY ARNOLD and RAYMOND PLASKETT

No. 15,966

United States Court of Appeals

Third Circuit

Argued January 31, 1967

Filed June 1, 1967

*See, also, 377 F.2d 804*

WARREN H. YOUNG, ESQ., Christiansted, St. Croix, Virgin Islands *for appellant*

ALFRED L. SCANLON, ESQ., Washington, D.C., U.S.A. *for appellees*

Before STALEY, *Chief Judge*, FREEDMAN and COFFIN,* *Circuit Judges*

COFFIN, *Circuit Judge*

### OPINION OF THE COURT

This is an appeal from an order of the District Court of the Virgin Islands denying plaintiff's alternative mo-

---

* Of the First Circuit, sitting by designation.

tions for judgment n.o.v. and new trial following special jury veridicts for defendants.[1]

The complaint charged defendants both as conspirators and as individuals with having libelled plaintiff. Plaintiff is a prominent St. Croix businessman, president of a corporation engaged in growing sugar cane, who served from 1951 to 1953 as a director and president of the Virgin Islands Corporation (VICORP). The eight defendants, originally eleven, were, at the time of the events complained of—September 1963—members of a faction or wing of the Democratic Party known as "Liberal Democrats identified by the Mortar & Pestle Symbol".

This cause of action arose out of the ferment occasioned in the autumn of 1963 by the election of members to the Territorial Committee of the Democratic Party.[2] During this campaign the Liberal Democrats published at several locations a political bulletin captioned "The Mortar Pestle" and mimeographed, appropriately, on yellow paper. The eleven issues introduced into evidence cover a period from September 7 to September 27, 1963. They deal with the contest between the Liberal Democrats and the opposing faction, the Donkeycrats, in terms of personalities and the good-evil dichotomy which are regrettably all too familiar hallmarks of political contests. The "Royal Family", including plaintiff, described as wealthy, self-seeking individuals controlling the Donkeycrats, were ranged against the Governor and the Liberal Democrats, the self-proclaimed forces of virtue. One of the few issues discussed was the future of the sugar cane subsidy; the Liberal Democrats backed the Governor's plan to lease

---

[1] While plaintiff also asserts an appeal from the judgment itself, such notice of appeal does not appear to have been filed within the required thirty days. This does not, however, foreclose plaintiff from raising the issues in brief and argument.

[2] See generally Alexander v. Todman, 3 Cir. 1964, 5 V.I. 137, 337 F.2d 692, cert. denied, 380 U.S. 915.

some cane land for citrus growing, and the Donkeycrats resisted.

Between September 7 and September 17, 1963, the date of the alleged libel, plaintiff was mentioned by name in three issues of "The Mortar Pestle" fifteen times and was caricatured in two crude cartoons. The references were, of course, uncomplimentary. Plaintiff was called a "reactionary", a "sugar baron", an opponent of economic progress, a "master of deceit", and mastermind of a plot to oust a public official. On September 17 a one-page edition of "The Mortar Pestle" appeared, half of which was devoted to "Facts You Should Know".[3] One of five "facts" was set forth in these words: "Do you know that when a certain large canegrower was President of VICORP he charged VICORP 5¢ a gallon to store molasses and then bought the same molasses for 3¢ a gallon?" This statement would seem to have been the proverbial straw. At any rate, it is before us as constituting the cause of action sued upon.

While, for a change, the plaintiff was not specifically identified, he recognized himself as being the only large cane grower who had held the office of President of VICORP and construed the statement as charging him "with having corruptly, fraudulently and unlawfully de-

---

[3] This section is reproduced in full, as follows:

FACTS YOU SHOULD KNOW

Do you know that 85 per cent of Virgin Islands rum is made in St. Thomas from molasses imported from Puerto Rico and the British Islands?

Do you know that 60 per cent of the molasses used in St. Croix is also imported from the British Islands?

Do you know that when a certain large cane grower was President of VICORP he charged VICORP 5¢ a gallon to store molasses and then brought the same molasses for 3¢ a gallon?

Do you know that Joe Alexander is ready to resign from the Donkey Slate if it were only possible?

Do you know that the Donkey Democrats are now serving the interests and continue to look out for the interests of Herbert Sugden (I got the money) and Dave Hamilton (Crucian Land made me a rich man) ? * * * Incidentally the above two men are offered to you on their territorial slate to make sure of a majority to protect their interests.

frauded the Virgin Islands Corporation, a United States corporation . . . . "

The cause went to trial in the spring of 1966. At the conclusion of plaintiff's evidence both sides moved for a directed verdict. Plaintiff's motion—the only one relevant to the issues here presented—was based on the contention that as a matter of law identification, defamation, and publication had been established, leaving nothing for the jury except damages. The judge denied the motion. Thereupon, defendants having rested, plaintiff's attorney offered for consideration a form of special verdict which was agreed upon along with the various jury instructions. There were no objections to the form of the special verdict or additional requests for instructions. The jury later requested and received a clarification of one of the questions put to it.

The jury rendered its verdict for defendants on the "First Cause of Action" charging conspiracy. It then found that defendants had published the offending issue, and made eleven further findings, which are set forth in the margin.[4]

---

[4] 1. Do you find the statement:
"Do you know that when a certain large canegrower was President of VICORP he charged VICORP 5¢ a gallon to store molasses and then bought the same molasses for 3¢ a gallon?"
pertained to plaintiff?
Answer— Yes No √
2. Do you find that the statement, if it pertained to plaintiff, is false?
Answer— Yes √ No
3. If you find that the statement is false, do you find that the defendants knew it to be false when it was published?
Answer— Yes √ No
4. Do you find that the statement was published in reckless disregard of whether it was true or false?
Answer— Yes √ No
5. Do find that the statement was published in reckless disregard of the rights of plaintiff?
Answer— Yes No √
6. Do you find that the statement charged plaintiff with fraudulent or dishonest conduct?
Answer— Yes No √
7. Do you find that the statement was published wilfully and with

The two basic issues are whether the district court erred in refusing to direct a verdict for plaintiff and whether, even if this action was not error, the special verdict is vulnerable, either because it is not supported by evidence or because it is fatally tainted by confusion and inconsistency.

Coming first to the ruling on plaintiff's motion for a directed verdict, we have noted that plaintiff asserted that identification, defamation, and publication had been conclusively proven. We agree that, on the evidence as a whole, the jury could not properly find that plaintiff had not been identified. Not only did five witnesses testify that they connected the description to plaintiff, but there was unimpeached, unrebutted evidence that plaintiff was the only person in the history of VICORP and its predecessor, the Virgin Islands Company, who could come within the description.[5]

■ The only witnesses who testified that they did not identify plaintiff with the description in the statement were seven of the defendants, four of whom also admitted that they knew plaintiff was a cane grower, had been

intent to injure plaintiff?
　　Answer—　　Yes　　No √
　　8. Do you find that the statement was published maliciously with intent to injure plaintiff?
　　Answer—　　Yes　　No √
　　9. Do you find that plaintiff suffered any injury as a result of the alleged published statement concerning him for which he should be compensated?
　　Answer—　　Yes　　No √
　　10. If your answer to question 9 is "yes", state the amount.
　　Answer—　　$ . . . . . . . . . .
　　11. Do you find that there should be assessed against defendants any exemplary or punitive damages?
　　Answer—　　Yes　　No √

[5] Defendants have argued that plaintiff himself did not come within the description since he testified that at the time he served as President of VICORP he had severed all his relationships with growing cane. This is hardly persuasive, since the language used in the alleged libel could naturally be read as referring to someone, now a cane grower, who once was President of VICORP. Nothing limits its application to someone who was both simultaneously.

president of VICORP, and that they could think of no other person fitting the description. Defendants seek comfort in the additional fact that the population of St. Croix has increased by 3,000 persons since plaintiff resigned his position with VICORP. But identification does not have to be by majority vote. It is enough if some readers reasonably understand that the plaintiff is meant. See generally Prosser, Torts § 106, at 767 (3d ed. 1964); 53 C.J.S. Libel and Slander § 11. It is clear to us—and apparently, from his comments in the record, also to the district judge—that there was no real doubt that the statement identified the plaintiff.

But plaintiff did not isolate this question as one to be taken from the jury. It was part of his three-pronged effort to take the entire case, apart from damages, from the jury. At no time did he press for an instruction that identification had been conclusively established. The other two issues were, in our opinion, appropriately left to the jury.

■ The question of defendants' responsibility for publication presented a factual issue. While defendants generally testified that they were members of the "Liberal Democrats identified by the Mortar & Pestle", and that the mimeographed newspaper was its organ, they also professed not to have anything to do with the particular issue of September 17 (except one defendant who admitted helping distribute it), and stated that they did not know who wrote, edited, typed, stencilled, mimeographed, or drew cartoons for it, or distributed it. Nor, according to their testimony, did they know who ran the publication generally. While the jury's finding on this point accords with our conclusion from reading the record, we cannot say that an opposite finding would have been without basis, for it is the jury's province to pass upon the credibility of witnesses. We note that the plaintiff argues in his brief

that "the evidence was conclusive that the defendants . . . were leaders and active workers of the organization that published the libelous statement." Conceding this, it does not follow as a matter of law that defendants were responsible for publication of the alleged libel. Plaintiff's only authority, Phelps Dodge Refining Corp. v. FTC, 2 Cir., 1943, 139 F.2d 393, specifically conditions liability of a member of a trade association on prior "knowledge that his fellows are acting unlawfully". Were political affiliation alone a basis for conclusively determining responsibility for publication of libels, political parties would suffer a mass exodus.

This leaves the issue whether the statement in question was defamatory as a matter of law.[6] We grant that, whatever meaning may be attributed to the statement, it was not intended to be complimentary. But this is usually the case when courts are required to rule on the construction of alleged defamatory words. The alternatives are not, ordinarily, speaking evil and speaking good, but casting defamatory aspersions and non-defamatory aspersions. Plaintiff alleges the the statement accuses him of corrupt and fraudulent conduct toward a United States corporation. We readily agree that it is capable of being so construed. We also agree that it was intended to convey a derogatory meaning.

The question before us, however, is whether the statement so precludes any non-defamatory meaning that the failure of a jury to find defamation would be capricious. There are at least four non-defamatory possibilities: (a) that the statement merely meant that plaintiff gave his

---

[6] Or, as counsel put it, "libelous per se". We prefer the phrasing in the text, since we are dealing here with whether the issue of defamatoriness should be put to the jury. Although the terminology is admittedly confused, we think it more consistent with history to reserve the label "per se" to cases raising the question whether special damages must be shown. See generally Altoona Clay Prods. Inc. v. Dun & Bradstreet, Inc., 3 Cir., 1966, 367 F.2d 625, 628 n.4.

storage facilities to the corporation at five cents a gallon for molasses and then, in a falling market, offered a market price for purchase of three cents; or (b) that the stored molasses had deteriorated to three cents, which was all that the molasses was worth; or (c) that, when the molasses was finally sold, he was no longer associated with VICORP; or (d) that storage costs were simply higher than the price of the commodity—a phenomenon not unfamiliar to American experience with agricultural surpluses.

Granted, all of these interpretations would picture the plaintiff as profiting at the government's expense, but is it so clear that crime, malfeasance, or even breach of fiduciary duty was necessarily involved? Could the statement not have been received as another gibe at one of the "haves" of the island? One witness testified that this was his interpretation.[7] We have found no case which persuades us to rule as a matter of law that the statement involved here was defamatory.

Washington Post Co. v. Chaloner, 1919, 250 U.S. 290, endorses the standard as framed a dozen years earlier by Judge, later Justice Lurton, in Commercial Pub. Co. v. Smith, 1907, 6 Cir., 149 Fed. 704. In that case defendant had published in its newspaper an article referring to plaintiff under the captain [sic] "Murderer Arrested" and stating that plaintiff, who had been arrested, had been "wanted . . . for killing old man F. E. Porch, the incentive being

---

[7] Part of the colloquy with defendant Williams proceeded as follows:

"Q. Suppose you were president of VICORP? A. Uh-huh (indicating yes).

"Q. And you charged VICORP eight cents a gallon to store molasses in some tank that you owned. A. Right.

"Q. Do you then, as president of VICORP, you could then sell it to yourself for three cents a gallon and not be guilty of a crime? A. Sir, in my opinion—if I were storing molasses in one of my tanks at $10 a gallon and VICORP had decided to get rid of that molasses, I would buy it for that price of $3 a gallon without feeling myself guilty of any crime.

"Q. This was your original thinking? A. Yes, it still is.

"Q. Still is your thinking? A. Still is."

robbery." The trial court had charged that the article was "actionable on its face", rejecting the defendant's theory that it only purported to report the fact of plaintiff's arrest. Then follows the oft-repeated language:

". . . A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read . . . ." 149 Fed. at 706–07.

What is not so often repeated is the concluding words of the court: "The case is to be retried. This fact makes it proper that we should express no opinion as to whether this meaning is the most natural interpretation, or one which imputes to the plaintiff the crime of murder." We take this to mean that a court should not take unto itself the task of deciding the "most natural" meaning of words, so long as another interpretation, "under all the circumstances", is within the bounds of reason.

A case analogous to that before us, Baker v. Warner, 1913, 231 U.S. 588, seems implicitly to follow this approach. In that case plaintiff, the United States District Attorney for the District of Columbia, had obtained an indictment against a person for betting at a race track. A demurrer was sustained, the court holding that the gaming law did not cover the location of the track. Pending appeal by plaintiff, no further prosecutions were initiated, although bookmaking and betting continued. Against this background defendant, a candidate for Congress, running against a friend of plaintiff, published a newspaper article

saying that his opponent and plaintiff had met with defendant's enemies to see what was needed to defeat him. The article continued, "The question now is, where does the money come from in the contest against [defendant]? How about the racetrack?" Plaintiff charged that this accused him of corruption in seeking campaign contributions from race track interests in exchange for refraining from prosecutions. The Supreme Court reversed a verdict for the plaintiff and ordered a new trial, noting error in the trial court's charge that the article was libelous as a matter of law, saying that the meaning of the words was for the jury. We have set forth the facts in some detail because a nondefamatory interpretation of the article in question appears to us considerably more strained than a nondefamatory interpretation of the words at issue in the case at bar.

 We have in mind also that Virgin Islands law, absent contrary local law or statute, incorporates the principles enunciated in "restatements of law approved by the American Law Institute". V.I. Code, tit. 1, § 4. The Restatement of Torts § 614 clearly leaves to the jury the interpretation of words capable of a nondefamatory meaning. Moreover, the law of libel in the Virgin Islands looks to that of New York. V.I. Code, tit. 3, § 1171, Revisor's Note. Thus, Sweeney v. United Features Syndicate, 2 Cir., 1942, 129 F.2d 904, is pertinent. Plaintiff, a Congressman, was described in defendant's newspaper column as being the chief Congressional spokesman of Father Coughlin and in "violent opposition" to the appointment of a Jewish judge, highly regarded by the Justice Department, on the basis of "the fact that Freed is a Jew, and one not born in the United States." The jury returned a verdict for defendant. Plaintiff claimed error in the refusal of the trial judge to charge that the statement was "libelous per se". The trial judge had left it to the jury whether there was another

meaning than that of anti-Semitism, whether, for example, the article might only mean that plaintiff felt that "a Hebrew . . . might not be the proper man at this time for this job." The court said:

"If, . . . there was an innocent interpretation of the meaning of the words used in their setting in the territory in which the publication occurred, it was for the jury to say upon all the evidence whether the article was defamatory or not. Such is the settled rule in the courts of New York . . . .

"That there was a possible meaning of the words published which the jury might have found and found not to have been defamatory cannot be doubted. The article does not in so many words charge that the plaintiff was anti-Semitic. It asserts that he opposed the appointment of Freed because he was a Jew and one not born in the United States. Opposition because Freed was a Jew might have been found by the jury to have been based upon political expediency rather than upon racial or religious prejudice against Jews; that he was actuated by a desire to reflect what he thought were the views of most of his constituents; or by a belief that a Jew should not be appointed a judge in that district at that particular time; or by an opinion that a representative of a different group should be appointed because of the importance he attributed to that group; or simply because he wanted some other man appointed and chose to state his opposition to Freed in terms not applicable, perhaps, to the candidate of his choice. Futhermore, the publication might have been among people who did not consider it defamatory to be called anti-Semitic anyway . . . ." 129 F.2d at 907–08.

█ Again we observe that a nondefamatory interpretation no more reasonable than that in this case, if as much so, was enough to send the issue to the jury. Indeed we have been pointed to no case, nor have we found one, where a court has declared words capable of more than one interpretation, even though not equally so, defamatory as a matter of law.

In sum, then, we conclude that the judge acted properly in refusing the motion for a directed verdict. This

253

leaves us with the problem of assessing the validity of the special verdict.

The principal challenge lies in the fact that the only question as to defamatory content was phrased in reference to plaintiff.[8] As we have seen, the jury erroneously found that the statement did not pertain to plaintiff. It is therefore vigorously argued that this erroneous finding permeated and infected the finding that the statement did not charge plaintiff with any fraud or dishonesty. While this is by no means a frivolous argument, and might well carry the day if we were construing words in some other setting, we labor here under the strong mandate of Rule 49(a) of the Federal Rules of Civil Procedure, which says:

". . . . If . . . the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

In this case it would have been clearer if the jury had simply been asked whether the statement had charged crime, fraud, or something degrading or tending to injure plaintiff in his profession. But the question was limited to a charge of fraud and dishonesty against the plaintiff. It was among those framed by plaintiff. No additional revisions were sought. Under these circumstances, "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." Atlantic & Gulf Stevedores, Inc. v. Ellerman

---

[8] A minor criticism stems from the fact that the jury in answer to question No. 3 found that defendants knew the statement to be false and in answer to question No. 4 found that the statement was published in reckless disregard of its truth or falsity. This apparently inconsistent finding can, however, be reconciled by assuming the jury found some of the defendants possessed of more knowledge than the others, but with all subscribing to a "damn the torpedoes, full speed ahead" attitude; or by assuming that all had substantial reason to believe the statement false and, additionally, did not care to doublecheck whether their information was accurate.

Lines, 1962, 369 U.S. 355, 364. With this bias, it is not difficult to read the answer to question 6 as meaning, "If the plaintiff was referred to, nevertheless the statement did not charge him with fraudulent and dishonest conduct." What we have said in discussing the issue raised by the motion for directed verdict on defamation applies a *fortiori* here, for the jury was confined to passing on charges limited to fraud and dishonesty. That the statement might have been construed as sharp practice in his occupation tending to bring shame on plaintiff was no longer included.

While we do not endorse the irresponsible namecalling and innuendo exhibited by "The Mortar Pestle", we do not think that the district judge committed error in refusing to enter judgment notwithstanding the verdict.

As for the motion for new trial, this was grounded solely on the theory that the verdict depended on the erroneous finding that the statement did not pertain to plaintiff. As we have explained, the error cannot be said to have invalidated the finding that the statement was not defamatory. We are unable to say that there has been such a miscarriage of justice as to warrant a new trial.