# IN THE MATTTER OF THE ESTATE OF MARGARITA ZIRI SAVAIN, Deceased

Probate Nos. 86/92 & 117/92

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

August 28, 1998

DANIEL RETTEW, ESQ. and DEAN BARNES, ESQ., *Counsel for Petitioner Ruth Robson*

Kwame Motilewa, Esq. and Richard Farrelly, Esq., *Counsel for Petitioner Ecedro Rabsatt*

DIASE, *Judge*

## MEMORANDUM OPINION

In these probate cases, the court is asked to decide whether a living trust created by the settlor-testatrix is valid and whether her subsequent will revoked the trust. The court finds that the living trust meets all legal requirements and is, thus, enforceable; and that the will could not and did not revoke the trust.

## I. FACTS

Margarita Savain ("Savain") died on St. Thomas, Virgin Islands on May 24, 1992. She was the owner of Parcel No. 41 Estate Caret Bay ("the property") on St. Thomas and various personal property. The property consists of approximately one acre of land and a three bedroom house, in which Savain resided, with an attached rental unit and a two bedroom wooden structure.

During her lifetime, Savain executed three wills and a living trust, all of which are at the center of this litigation. On February 24, 1981, Savain created the Margarita Savain Trust ("trust") through a written instrument. The trust's pertinent provisions are as follows:

1) that she was a lifetime beneficiary and could reside at the property and collect the rentals;

2) that upon her death, the trust estate would be distributed to her brother, Marcelo Ziri ("Ziri"); but if he predeceased her, then it would be distributed to her friend Ruth Robson ("Robson");

3) that she was the initial trustee; and upon her death, Ziri would be the trustee, unless he predeceased her, and then Robson would be the trustee;

4) that the property was transferred to the trust; and

5) that the trust could be amended, modified, and revoked "by filing notice of such revocation, modification, change, or withdrawal with the Trustee." The trust was recorded on April 29, 1981 at the Recorder of Deeds Office for St. Thomas and St. John.

Sometime in early 1983, Savain sought to borrow money from a bank and mortgage the property. She discovered, however, that the

78

trust did not authorize her to do so. She had an amendment to the trust prepared specifically granting her the power to mortgage the property. This document is entitled First Amendment to the Margarita Savain Trust ("amendment"). It is not certain who prepared the amendment for her.

Savain executed the first will on October 7, 1983 in her attorney's office. This instrument will be referred to as Will No. 1. It was prepared by a lawyer in approximately 1980, but it is also not certain who actually prepared it. Will No. 1 provided for a similar distribution as the trust: whatever property she owned at the time of her death would be devised and bequeathed to Ziri, and if he predeceased her, then to Robson. On the same day that she executed Will No. 1, she also executed the amendment. Both documents were witnessed, notarized and recorded at the Recorder of Deeds Office for St. Thomas and St. John on October 7, 1983.

From April 29, 1992 through May 18, 1992, Savain was hospitalized on St. Thomas. She was diagnosed with advanced cervical cancer. While she was in the hospital, on May 8, 1992, she purportedly signed another will, known as Will No. 2, leaving her entire estate to one of her tenants, Paul Schack. That will was declared invalid by the court in a prior decision.

Also while she was hospitalized, she executed a third will, known as Will No. 3, on May 12, 1992. This will provided that her sole beneficiary was Ecedro Rabsatt ("Rabsatt"), a longtime friend and specifically referred to the property as being devised to him. Rabsatt did not know of the existence of the trust. Ziri predeceased Savain in 1990 and the court is not aware of any other relatives of Savain, as her siblings died childless. Robson was also a good friend of Savain.

Rival petitions for the admission of the wills to probate were filed by Robson, Schack and Rabsatt. The procedural history of these cases and issues surrounding the wills have been addressed in detail in a Memorandum Opinion that was issued simultaneously with the instant Opinion. In relevant part, the court held in that Opinion that Wills No. 1 and 3 were valid wills and that Will No. 3 would be admitted to probate as Savain revoked Will No. 1. Due to the ruling in the instant case, however, Will No. 3 can only distribute the testatrix's personal property.

## II. LEGAL DISCUSSION

### A. Validity of the Trust

Rabsatt argues that the trust is invalid for four reasons. First, the sole trustee and the sole beneficiary were improperly the same person — Savain. Second, Savain as settlor retained total, unbridled control of the trust corpus, the naming of the trustee and the beneficiary, and the power to modify, revoke and manage the trust. In essence, therefore, she never divested herself of the ownership and control of the property, and the trust was just "illusory". Third, Savain never funded the trust. And, fourth, Savain never acted as if the trust existed.

A trust is defined as "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." RESTATEMENT (SECOND) OF TRUSTS § 2 (1959).[1] It consists of three elements: "(1) a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; (2) a beneficiary, to whom the trustee owes equitable duties to deal with the trust property for his benefit; [and] (3) trust property, which is held by the trustee for the beneficiary." *Id.* cmt. h. The person who creates the trust is known as the settlor. *Id.* § 3(1)

There are various classifications of trusts depending on their method of creation. The Savain trust is a living or *inter vivos* trust. It was created during the settlor's lifetime to go into effect during her lifetime. This is distinguished from a testamentary trust which is contained in a will and goes into effect upon the testator's death. George G. Bogert & George T. Bogert, *The Law Of Trusts And Trustees* § 1 (2d ed. 1984).

Modern times have seen a tremendous increase in the use of living trusts among property owners as they provide a legal means of conveying assets without a will and obviate the delay and expense involved with probating a will through the court. Indeed,

---

[1] 1 V.I.C. § 4 (1995) provides that the rules of common law as contained in the restatements of the law shall be controlling in the Virgin Islands courts unless there are local laws to the contrary.

"it has become a common practice for property owners to convey part or all of their assets to a trustee for the purposes of holding for the benefit of the settlor for life, subject frequently to reserved powers in the settlor, and with a direction to ... hold in trust or distribute the remaining trust principal to or for the benefit of relatives, friends or charities." *Id.* 104 at 254.

## 1. Sole Trustee as Sole Beneficiary/Sole Beneficiary as Sole Trustee

For a viable trust to be created, there must be "a separation of interests in the subject matter of the trust, the beneficiary having an equitable interest and the trustee having an interest which is normally a legal interest." RESTATEMENT (SECOND) OF TRUSTS § 2 cmt. f. Legal title to the trust property is typically held by the trustee. Bogert, *supra* § 1. It is well settled that the sole trustee of the trust cannot be the sole beneficiary of the trust and *vice versa*. RESTATEMENT (SECOND) OF TRUSTS 115(5), 99(5). Where legal title to the trust property and the entire beneficial interest come together in the same person and thus, there is no separation of legal and equitable interests of a trust, the interests are deemed to have merged. Where the intended beneficiary and trustee are the same, no trust is created. Austin W. Scott & William F. Fratcher, *The Law Of Trusts* § 99 (4th ed. 1987). Further, where, at the outset a trust existed, but a single individual subsequently holds both the legal and equitable interests, the trust terminates. Restatement (Second) of Trusts § 341(1); Scott, *supra*. The underlying rationale for this doctrine, known as merger, is as follows.

> [Since] there is no separation of the legal and beneficial interests ... there are no duties running from [a person] to himself, and no rights against himself. He is in a position where he can dispose of the property as freely as any owner can do, since there is no one who can maintain a proceeding against him to prevent him from doing so, and if he transfers the property there is no one who can make him accountable for the proceeds or can reach the property in the hands of the transferee.

RESTATEMENT (SECOND) OF TRUSTS § 99 cmt.; Scott, *supra* § 341.

81

Importantly, however, "equity will not apply merger if serious injustice would result or if the settlor's intent obviously would be frustrated." Bogert, *supra* § 129 at 398.

■ Under the facts such as in this case, where the settlor retains only a life estate in the trust income, with the corpus of the trust to pass to certain designated individuals upon her death, the question arises as to whether she is the sole beneficiary of the trust. The unequivocal answer is that she is not.

The term beneficiary is defined as "the person for whose benefit property is held in trust ...." RESTATEMENT (SECOND) OF TRUSTS § 3(4). A beneficiary's interest in a trust may properly be a future interest which is either vested or contingent. *Id.* § 129 cmt. b. The holder of a life estate is not considered to be a sole beneficiary. Scott, *supra* § 127.1.

The position that there is no merger is further supported by at least one learned treatise on trusts. The *Law of Trusts* establishes that a trust is created where A is the sole trustee and A and B are the beneficiaries, with A's and B's interests being simultaneous or successive, as we have here. Where A is the trustee and is to receive the income from the trust for life, and on his death the principal is to be paid to B, "A is a trustee for himself and B, and B has an enforceable equitable interest." Scott, *supra* § 99.3 at 54. Indeed, B can "enforce the trust and hold [A] liable for breach of trust." *Id.* § 99.1 at 50. The fact that A is the sole trustee "is not fatal to the existence and continuance of the trust. Certainly there will not be a complete merger extinguishing the beneficial interest of with the result that A holds the entire property free of trust." *Id.* The writer further comments that it is somewhat surprising, indeed, that counsel should seriously urge on the court a view producing so unjust a result [as A holding the property free of the trust]." *Id.*

Additionally, there are enforceable equitable duties that run from a trustee, who is also a beneficiary, to the other beneficiaries. The trustee is "under a duty to the successive beneficiaries to act with due regard to their respective interests." RESTATEMENT (THIRD) OF TRUSTS § 232 (1990). Specifically when there is an income beneficiary and successive beneficiaries, the trustee's duties are as follows:

[T]he trustee is under a duty to the income beneficiary to exercise care not merely to preserve the trust property but to make it productive of trust income so that a reasonable amount of income will be available for that beneficiary. The trustee is also under a duty to the remainder beneficiary to exercise reasonable care in an effort to preserve the trust property ....

*Id.* cmt. c. Where the trustee is given discretion to invade the trust principal, the trustee has a fiduciary obligation to the remaindermen to confine his demands within reasonable limits. *Ammco Ornamental Iron, Inc. v. Wing*, 26 Cal. App. 4th 409, 31 Cal. Rptr. 2d 564, 570 (Cal. Ct. App. 1994).

All the formal requirements for creating a valid trust have been clearly met. There is a trustee, Savain; there are beneficiaries; and there is trust property. Indeed, there is no doubt that Savain was a beneficiary of the trust as she possessed a life interest. She reserved the right to all income from the property and to continue to live on the property during her lifetime. Ziri was also a beneficiary, as he had a vested future or remainder interest: upon Savain's death, the entire trust estate was to be transferred to him. *See* RESTATEMENT OF PROPERTY §§ 156, 157 (1936); *In re Estate of Brenner*, 37 Colo. App. 271, 547 P.2d 938 (Cob. Ct. App. 1976). Robson was a third beneficiary, as she possessed a contingent future interest, or what is also known as a remainder interest subject to a condition precedent, that would vest only if Ziri predeceased her. *Id.*

■ It is further evident from the trust instrument itself that Savain intended to create a trust. She further intended to be a life beneficiary with the property to be transferred to either Ziri or Robson upon her death. To hold that the doctrine of merger applies would be to frustrate her clear desires, and this court is unwilling to do so.

## 2. Settlor's Extensive Control of the Trust

A trust can be declared incomplete and "illusory" if the settlor has reserved virtually complete control over the trustee's administration of the trust and over the trust corpus. Under such circumstances, even though the trust instrument names a benefi-

ciary, the settlor remains the owner of the property and there is actually no beneficiary. *Roberts v. South Oklahoma City Hospital Trust*, 742 P.2d 1077 (Okla. 1986). Rabsatt asks the court to declare the Savain trust invalid as it is illusory since she retained extensive powers over the naming of the trustee and beneficiary; modifying and revoking the trust; and administering the trust.

A settlor's reservation of broad powers is supported by the Restatement of Trusts. Section 37 establishes that a settlor can reserve "any power which he desires with respect to the property, if the power is not illegal ... and the reservation of the power will not of itself make the trust invalid." RESTATEMENT (SECOND) OF TRUSTS § 37 cmt. a. In fact, the Restatement stresses that "there is no specific limit to the nature or extent of the powers which the settlor may reserve", and lists the following as some examples of those powers: to revoke the trust; to alter or amend the trust; to control the trustee in determining what investments to make and then what to do with those investments; and to change the beneficiaries of the trust." *Id. "There is no specific limitation on the number or the nature of such powers, and they may be included in the terms of the trust in such number and of such nature as the settlor desires." Id.* (emphasis added); *see also* § 57.

So long as the settlor reserves the power to revoke the trust in the trust instrument, the settlor has the power to do so. *Id.* § 330(1). Again, the reservation of such power does not render the trust invalid. *Id.* cmt. f. In the same vein, the settlor further has power to modify the trust to the extent such power is reserved in the trust instrument. *Id.* § 331(1). This rule applies even though the settlor declares himself as trustee. *Id.* cmt. f. And, the reservation of such a power does not make the trust invalid or incomplete. *Id.* cmt. j.

Historically, the illusory doctrine has been urged to invalidate trusts which interfere with the right of election of a surviving spouse or other rights between spouses or trusts which are created to avoid creditors. Bogert, *supra* § 233; *In re Will of Sackler*, 145 Misc. 2d 950, 548 N.Y.S.2d 866 (Sur. Ct. 1989); *see also Halliburton Co. v. E.H. Owen Family Trust*, 28 Ark. App. 314, 773 S.W.2d 453 (Ark. Ct. App. 1989) (avoidance of creditors); *Johnson v. La Grange State Bank*, 73 Ill. 2d 342, 383 N.E.2d 185, 22 Ill. Dec. 709 (Ill. 1978) (surviving spouse's property rights); *Goodrich v. City National Bank*

84

*& Trust*, 270 Mich. 222, 258 N.W. 253 (Mich. 1935) (right of election of surviving spouse); *In re Estate of Soltis*, 203 Mich. App. 435, 513 N.W.2d 148 (Mich. Ct. App. 1994) (right of election of surviving spouse); *Seifert v. Southern National Bank*, 305 S.C. 353, 409 S.E.2d 337 (S.C. 1991) (reduction of spouse's elective share); *Westerfeld v. Huckaby*, 474 S.W.2d 189 (Tex. 1972) (non-consenting spouse's property used to fund the trust).

Specifically in regard to *inter vivos* trusts, the issue of the settlor's extensive control is typically raised under the argument that the practical effect is a testamentary disposition, rather than a trust, and the instrument should be void unless it satisfies the formalities of the wills act. Bogero, *supra* § 104. This is especially argued where the settlor reserves an interest in the trust for life, as well as powers of alteration, revocation and management. "In the great majority of the decisions where this point has been raised it has been held that such a trust instrumenis not in reality an attempted will, but is rather a valid inter vivos trust." *Id.* at 266. Importantly, "the trend of the modern authorities is to uphold an inter vivos trust no matter how extensive may be the powers over the administration of the trust reserved by the settlor." Scott, *supra* § 57.2 at 140; *see also* W. W. Allen, Annotation, *Validity of Trust Created by Nontestamentary Instrument Reserving Benefit to Settlor for Life with Power of Revocation*, 32 A.L.R. 2d 1270 (1953 & Supps. 1989 & 1997).

■ Savain reserved considerable powers in herself as settlor. These powers included appointing a successor trustee; revoking or modifying the trust; changing the beneficiaries; withdrawing any part of the trust estate; and directing the investments. However, based on the great weight of legal authority, the reservation of these powers does not invalidate the trust in any way.

Rabsatt cites to *Roberts v. South Oklahoma City Hospital Trust*, 742 P.2d 1077 as authority for the court to declare the trust illusory. The facts and underlying legal principles in that case, though, are divergent from the present case. In *Roberts*, the Supreme Court of Oklahoma addressed a very narrow issue — whether South Community Hospital Trust d/b/a South Community Hospital was a valid public trust under Oklahoma law. The action involved a medical malpractice claim against the hospital and the attending

physician. The hospital raised a statute of limitations defense, asserting that it was a public trust and, ultimately, a political subdivision, entitling it to a one year notice requirement. The court found that the hospital was created by a public trust instrument naming the city of Oklahoma City as its beneficiary. It held that the trust was illusory as the city never received any direct benefit and the hospital operated its daily private business without any interference from or accountability to the city. Here, there is a trust created by a private individual, Savain, for her and her other beneficiaries, not a public trust. As the life beneficiary, she received a direct benefit since she resided on the property and collected the rentals therefrom. Upon her death, the succeeding beneficiary would obtain the entire corpus of the trust.

### 3. Funding of the Trust

Rabsatt next argues that the property was never transferred to the trust and therefore, the trust was invalid as it had no corpus. This position, however, is contrary to legal authority and the evidence.

"When the settlor declares himself trustee, retention of possession of the trust property by him is natural and usual. In order to perform his duties in protecting the trust property and collecting its income, the trustee must have dominion over it." *Bogert, supra* § 148 at 64. Moreover, where "the owner of property declares himself trustee of the property a transfer of the property is neither necessary nor appropriate. ... It is sufficient that he manifest an intention forthwith to become trustee of the property. RESTATEMENT (SECOND) OF TRUSTS § 32 cmt. m.

The Virgin Islands do not have any statutory authority mandating the recording of a trust instrument. When such an instrument creates an estate or interest in land, whether that interest is legal or equitable, it is deemed a conveyance. V. I. CODE ANNOTATED tit. 28 § 1 (1996). If a conveyance is not recorded, it is void against any subsequent innocent purchaser in good faith and for a valuable consideration of the same property ... whose conveyance is first duly recorded." *Id.* § 124. The primary purpose of recording the trust "would not be to aid in the creation of the trust, but to protect the beneficiaries against a second transfer of the same equitable interest to a bona fide purchaser ...." Bogert, *supra* § 149 at 71.

■ Savain accomplished all that she was required to for the transfer of the property to the trust and legal title to the trustee. In paragraph 1 of the trust, she specifically transferred 'the property listed in Schedule 'A'" to the trustee. The attached Schedule A refers to the property as "comprising the initial Trust res". Although not required by Virgin Islands law, she took the preferred action of recording the trust at the Office of the Recorder of Deeds, Division of St. Thomas and St. John on April 29, 1981, thereby protecting all the interests of the beneficiaries.

**4. Settlor's Actions**

Lastly, Rabsatt asserts that Savain's own actions show that she never intended to create a trust and dealt with the property at all times as if it still belonged to her personally. He points to Will No. 1 and a power of attorney she executed in April, 1992 as support for his claim. The court disagrees with Rabsatt's assertion and finds that there is credible evidence to the contrary.

■ There is no doubt that Savain intended to create a trust. She signed the trust instrument and it was duly recorded. Her actions of continuing to reside on the property and collect the rentals were in conformity with the trust and her rights as the life beneficiary. The only property she transferred to the trust was the real property at Parcel No. 41 Caret Bay, and she reserved for herself a life interest. Will No. 1 in no way contradicts the trust. Pursuant to section III of the will, she devised and bequeathed "all of my estate and property, both real and personal ... of which I may die seized or possessed, or to which I have any right, title or interest at the time of my death." Since the property was no longer a part of her estate, it was not subject to being devised.

Critically, evidence that shows Savain continued to act in accordance with the trust is the 1983 amendment. When she needed to borrow money against the property, she discovered that the trust gave her as trustee no such powers. The trust was accordingly amended granting the power to the trustee to mortgage the property.

In regard to the power of attorney, it is accurate that Savain signed one in April, 1992. She appointed Rabsatt as her attorney-in-fact. However, nothing in the specific powers granted evince a

contradiction with the trust. She gave Rabsatt the authority to sign documents on her behalf; to sign her checks; to make deposits; to sign lease agreements; and pay her bills. As she retained a life interest in the property, the powers she gave to Rabsatt were consistent with this interest.

Additionally, Rabsatt himself testified that he needed the power of attorney in order to enroll Savain in the government's "Meals on Wheels" program. In fact, he assisted in having it prepared for Savain. And, there was no evidence that Rabsatt used it for any other purpose. To allow this argument to invalidate the trust would be unjust.

### B. Revocation of the Trust

Rabsatt, alternatively, argues that, if the court concludes that the trust is valid, Savain revoked it by executing Wills Nos. 1 and 3 and the power of attorney. Rabsatt emphasizes particularly the specific devise in Will No. 3 of the property to him.

Neither of the wills mention the trust. And, the only reference to revoking anything is made in the opening paragraph of each will. In Will No. 1, Savain "revoked all former Wills by me made". In Will No. 3, Savain provided that she was "hereby cancelling, annulling, and revoking any and all Wills, Testaments, or Codicils made by me at any time heretofore." The court must, therefore, determine whether a will can revoke a trust.

According to the RESTATEMENT (SECOND) OF TRUSTS § 330(1), "the settlor has power to revoke the trust if and to the extent that by the terms of the trust he reserved such a power." If the settlor specifies in the terms of the trust the particular manner in which the trust can be revoked, the settlor can then only revoke the trust in that manner. *Id. cmt. j.* Importantly, "if the settlor reserves a power to revoke the trust by a transaction inter vivos, as, for example, by a notice to the trustee, he cannot rebuke the trust by his will." *Id.* This position taken by the Restatement continues to be the general rule accepted by an overwhelming majority of the courts in the United States. Bogert, *supra* § 1001; John P. Ludington, Annotation, Exercise by *Will of Trustor's Reserved Power to Revoke or Modify Inter Vivos Trust*, 81 A.L.R. 3d 959 (1977 and Supp. 1997).

■ Paragraph 13 of the trust provides that it may be revoked "by filing notice of such revocation ... with the Trustee." Rabsatt argues that since Savain was the settlor and trustee, she did not need to give herself any notice and that her execution of Will No. 3 containing the specific devise of the property to him was sufficient to revoke the trust. The problem with this argument is that the will does not take effect until Savain dies. When she reserved the power to revoke the trust, Savain required an *inter vivos* act to accomplish the revocation — the filing of the notice. The majority of jurisdictions hold that a will does not constitute an act during the settlor's lifetime as it does not take effect until the person's death and is probated. Ludington, Annotation, *supra*. This court must follow the RESTATEMENT (SECOND) OF TRUSTS § 330 (1), comment j, which explicitly prohibits an *inter vivos* trust from being revoked by a will, where the power of revocation was reserved to an *inter vivos* act.

In those small number of cases in which courts have held that a will may effectively revoke an *inter vivos* trust during the settlor's lifetime, the will has had clear language stating that the trust is revoked. For example, in *In re Estate of Lowry*, 93 Ill. App. 3d 1077, 418 N.E.2d 10, 49 Ill. Dec. 366 (Ill. App. Ct. 1981), the testatrix-settlor executed an *inter vivos* trust, and reserved the power to revoke the trust during her lifetime by an instrument in writing and delivered to the trustee or co-trustees. She also served as the trustee. Five years later, she executed her last will, in which she explicitly referred to the trust and stated that she was revoking it. The Illinois Court of Appeals, in a well reasoned and persuasive decision, held that a will can serve as a testamentary instrument as well as a revocatory instrument, where there is clear language of the revocation. It reasoned that, had the paragraph in the will revoking the trust not in actuality have been in the will, but was in a separate document, the intended revocation would have been effective.

Likewise, in *Euart v. Yoakley*, 456 So. 2d 1327 (Fla. Dist. Ct. App. 1984), ironically a case cited by Rabsatt, the testatrix-settlor established an *inter vivos* trust and title to various properties including certain real property in Fort Lauderdale, Florida constituted a trust asset. Four years later, she executed a will in which she specifically

devised the Fort Lauderdale property to the appellant, Norton Euart. Euart, like Rabsatt here, argued that the provision in the will that devised the real property to him served as a revocation of the trust. Euart, though, only claimed there was a partial revocation. The Florida Appellate Court held that "a will is an instrument in writing which can be ar appropriate mode of fully or partially revoking an *inter vivos* trust when it is signed by the settlor and delivered ...." *Id.* at 1329. Importantly, though, the court further held that the will can have such a revocatory effect "only when the language clearly and explicitly manifests such an intent" and "overcomes the normal testamentary character of a will provision." *Id.* It refused to conclude that there was a partial revocation of the trust, as it found that the language in the will did "not even inferentially refer to the trust agreement"; that it was "patently ineffective to manifest a present intent to revoke" the trust; and it was "merely dispositive in nature and, thus, testamentary." *Id.*

In order for this court to even consider departing from the RESTATEMENT (SECOND) OF TRUSTS and the decisions of the majority of the courts, there must be specific language in the will referring to the revocation of the trust. As mentioned previously, there is no such language. Like *Euart,* this court finds the language in the will to be simply "dispositive in nature" and an attempt to distribute the trust assets, and was not a plain manifestation of an intent to revoke the trust. Unlike *Lowry,* if the language from the will was taken out and put into a separate document, it would not be sufficient to be an effective revocation.

Similarly, in regard to the power of attorney, Savain made no reference whatsoever to the trust in that document. And, as discussed previously, the powers she granted were consistent with the authority she had as a life beneficiary. Nowhere has Rabsatt cited the court to any legal authority supporting his position.

### III. CONCLUSION

Savain's *inter vivos* trust is entitled to full enforcement by the court. As a result, legal title to the property passes to Robson. An appropriate order will be entered.