**IN RE: KELVIN MANBODH ASBESTOS LITIGATION SERIES;
KELVIN MANBODH, ET AL., Plaintiffs
v.
HESS OIL VIRGIN ISLANDS CORPORATION, ET AL.,
Defendants.
HESS OIL VIRGIN ISLANDS CORPORATION,
Third Party Plaintiff
v.
LOCKHEED MARTIN CORPORATION, ET AL.,
Third Party Defendants.
LITWIN CORPORATION and LITWIN PAN-AMERICAN
CORPORATION, Third Party Plaintiffs
v.
UNIVERSAL OIL PRODUCTS COMPANY, ET AL., Third Party
Defendants**

Asbestos Docket Master Docket No. 324/1997,
Civil No. 324/1997

Superior Court of the Virgin Islands

Division of St. Croix

November 23, 2005

THOMAS ALKON, ESQ., Law Offices of Thomas Alkon, Christiansted, St. Croix, *Attorney for Plaintiffs*.

KEVIN A. RAMES, ESQ., Kevin A. Rames, P.C., Christiansted, St. Croix, VI, *Attorney for Shell Oil Company.*

CHERYL FALVEY, ESQ., Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, D.C., *Attorney for Shell Oil Company.*

CABRET, *Judge*

## MEMORANDUM OPINION

(November 23, 2005)

THIS MATTER is before the Court on Defendant Shell Oil Company's [hereinafter "Shell"] Motion for Summary Judgment. The Plaintiffs[1] oppose this Motion. Both the Plaintiffs and Defendant filed supplemental responses after conducting additional discovery. Motions for Joinder in Support of and in Opposition to this Motion for Summary Judgment, by Mobil Oil Company [hereinafter "Mobil"] and Litwin Corporation [hereinafter "Litwin"], respectively, were denied as untimely. Following a recent status conference, the Court again granted leave to Shell, Plaintiffs, Hess Oil Virgin Islands Corporation [hereinafter "HOVIC"], and Litwin to file supplementary briefings. Finding genuine issues of material fact as to some counts, this Court grants the motion in part and denies the motion in part.

### I. BACKGROUND

From 1982 to 1988, Shell supplied catalyst[2] for use in production activities to the HOVIC refinery located on St. Croix. Delivered in 55-gallon drums, "supersacks," or tote-bins, catalyst pellets were loaded into one of approximately fifteen reactors at the HOVIC plant during an eight-hour procedure by employees of sub-contractor Litwin under the supervision of HOVIC. This process entailed placing the pellets onto a

---

[1] 211 plaintiffs brought suit against Shell in the *In re Kelvin Manbodh Asbestos Litigation Series,* and all but four remain a party to these proceedings.

[2] Shell supplied nickel/molybdenum catalyst and catalyst support balls (product numbers 324, 424 and 514), in unknown amounts during said period to facilitate chemical reactions. (Trevino Dep. at 22:21, Ex. 2-C.) By its correspondence and bulletins, Shell also discussed supplying cobalt/molybdenum catalyst and catalyst support balls (product numbers 444 and 544). (*Id.*; Willett Dep. at 83-92.) Each of the nickel catalysts and cobalt catalysts, regardless of the particular generation of catalyst, individually, presented the same health and safety risks to employees. (Willett Dep. at 120:24-25.)

"hopper" which was raised by crane to the top of the reactor and then emptied by several employees. Often, employees would enter the reactor to determine if the correct amount of catalyst had been added. Afterwards, the catalyst would not be handled again until it was "spent," anywhere from six months to three years later, depending on the rate of consumption. At that time, a similar procedure, though in the reverse, was employed, disposing of the spent catalyst and replacing it with a new supply. During either of these processes, workers at the plant could have inhaled "fines," or catalyst dust. As a part of standard protocol, at any given time, approximately one million pounds of catalyst were in use at the HOVIC plant.

Beginning in 1996, the Plaintiffs, employees of HOVIC and Litwin, sued Shell, among other defendants, for injuries stemming from exposure to toxic substances, on grounds of: (1) negligent failure to warn (Count I); (2) supplying a chattel dangerous for intended use, defective by way of failure warn (Count II); (3) battery (Count III); and (4) fraudulent concealment (Count IV). Several plaintiffs also maintained actions for punitive damages (Count V) and loss of consortium (Count VI), where applicable. All counts therein pertained to Shell's supply of catalyst. In 1997, the Plaintiffs' cases were consolidated into a pretrial docket under the caption of *In re Kelvin Manbodh Asbestos Litigation Series,* Civ. No. 324/1997. After settling claims against most of the other defendants,[3] the Plaintiffs maintained this suit against Shell.

By motion, Shell asserts, as its primary contention,[4] that under the RESTATEMENT (SECOND) OF TORTS sections 388(c) comment n and 402A(1) (1965) and RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY section 2 comment i (1998), the sophisticated intermediary affirmative defense serves to discharge its duty to warn HOVIC and/or

---

[3] All other defendants, aside from Mobil Oil Company, another catalyst supplier, settled with Plaintiffs or were dismissed from the case.

[4] Originally, Shell argued that summary judgment was proper based on alternative grounds, both the Plaintiffs' failure to designate a liability expert and the sophisticated intermediary defense, an affirmative defense in failure to warn actions (Counts I and II) recognized by numerous jurisdictions and the RESTATEMENT (SECOND) OF TORTS § 388 cmt. n. (1965). The liability expert ground appears to have been abandoned, as it has not been discussed in responses subsequent to the close of discovery. In conjunction, Shell still claims that with regards to the battery (Count III) and fraudulent concealment (Count IV) counts, the Plaintiffs failed to establish the requisite elements, specifically intent, necessary for the causes of action to stand.

Litwin employees of the alleged latent dangers of its catalyst product. This, Shell claims, bars the Plaintiffs from any recovery and makes summary judgment appropriate. The Plaintiffs counter, arguing that the Virgin Islands have not adopted the sophisticated intermediary defense, and that in the event that it is adopted, genuine issues of material fact exist as to its elements. The Court agrees that the sophisticated intermediary defense should be applied in the Virgin Islands, but finds that the Plaintiffs have created a genuine, triable issue of material fact as to the reasonableness of Shell's reliance on HOVIC to convey the warnings. Summary judgment on Counts I and II, therefore, is denied.

## II. SUMMARY JUDGMENT STANDARD

The standard governing summary judgment in the Superior Court is found in Rule 56 of the Federal Rules of Civil Procedure. SUPER. CT. R. 7; *see Green v. Hess Oil V.I. Corp.*, 29 V.I. 27, 30 (Terr. Ct. 1994) (applying Federal Rule 56 to a motion for summary judgment). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). While substantive law will determine if a fact is material, whether a dispute of material fact is genuine instead turns on the presence of evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Courts deciding whether such genuine issues exist shall view the facts in a light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Christopher v. Davis Beach Co.*, 15 F.3d 38, 40, 29 V.I. 388 (3d Cir. 1994). Consequently, the initial burden of proof for summary judgment lies with the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). However, once the moving party has carried its burden of establishing the absence of genuine issues of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

■ Where the nonmoving party bears the burden of proof at trial and the elements of the cause of action are in dispute, "it must by affidavits or by the depositions and admissions on file 'make a showing sufficient to establish the existence of [every] element essential to that party's case.'" *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the Court may grant summary judgment. *Anderson*, 477 U.S. at 249-50. Nevertheless, a trial court should act with an abundance of caution in granting summary judgment, and may deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial. *Id.* at 254.

### III. CHOICE OF LAW

The parties' uncertainty regarding the applicable Restatement provisions[5] squarely raises the issue of choice of law. A searching inquiry into the governing law is necessary because the RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY section 2 and the RESTATEMENT (SECOND) OF TORTS sections 388(c) and 402A, in the failure to warn context, offer different remedies and affirmative defenses. Specifically, this case concerns the continued viability of failure to warn causes of action premised both in negligence and strict liability and the applicability of the sophisticated intermediary defense to bar recovery in either or both settings. These issues are fairly raised because there was a significant restructuring[6] in the American Law Institute's treatment of

---

[5] Although the initial memoranda discuss relevant provisions of the Restatement (Second) of Torts, both Plaintiffs and Defendant now agree that the Restatement (Third) of Torts: Products Liability governs this dispute.

[6] Under the Restatement (Second) of Torts, the cause of action for negligent failure to warn is embodied in section 388(c). In relevant part, the Restatement provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier ...
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

RESTATEMENT (SECOND) OF TORTS § 388(c).

The cause of action for strict liability failure to warn, is implicitly contained in section 402A (the defective condition being the failure to warn), which provides, in pertinent part:

(1) One who sells any product in a *defective condition* unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A (emphasis added).

The RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY in section 1, comment a and section 2, comment n, abandon doctrinal designations in a failure to warn context. In comment a to section 1, the drafters acknowledge that RESTATEMENT (SECOND) OF TORTS section 402A was ineffective in handling design defects and defects based on inadequate instructions (i.e. failure to warn), whose defining characteristic, the defect existed in all products, was distinct from manufacturing defects where the defect existed in only a select few. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 1 cmt. a, § 2 cmt. n. While an inquiry into a manufacturing defect was appropriately viewed through a lens of strict liability because the defect was an aberration of the manufacturing process, the analysis of other defects instead focused on the reasonableness of the manufacturer's decision-making, a test more appropriate in a negligence context. *Id.* The language of these provisions—sections 388 and 402A—was redrafted in the most recent version of the Restatement to separate the analysis accordingly. The new sections now work in tandem, with section 1 creating a unitary cause of action for defective products and section 2 defining the types of defects and their corresponding standards:

§ 1. Liability of Commercial Seller or Distributor for Harm Caused by Defective Products

One engaged in the business of selling or otherwise distributing products who sells or distributes a *defective product* is subject to liability for harm to persons or property caused by the defect.

§ 2. Categories of Product Defect

A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:

(a) **Manufacturing Defect:** contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;

(b) **Design Defect:** is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

(c) **Warning Defect:** is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution,

failure to warn causes of action. Because each Restatement will produce different results, this Court must choose a particular Restatement to clarify the rights of the parties to this Motion.

The Territory of the Virgin Islands possesses a unique status[7] in American jurisprudence because of its adoption of the American Law Institute's [hereinafter "ALI"] Restatements of Law as its primary rules of decision "in the absence of local laws to the contrary." V.I. CODE ANN. tit. 1, § 4 (1995). The statute provides:

> The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.

1 V.I.C. § 4. Title 1, section 4 commands courts to apply the rules of the common law where there is no local law to the contrary. To identify the applicable common law in those circumstances, the language of title 1,

---

and the omission of the instructions or warnings renders the product not reasonably safe.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY §§ 1, 2 (emphasis and bolded subtitles added). The new provisions create one cause of action, where two existed before, for defective warnings whose touchstones are the (1) existence of a defect, (2) foreseeability of the risk of harm and (3) reasonableness of the potential precautions in avoiding/reducing that risk. Of particular import is the abandonment of the typical strict liability/negligence designations. Comment n to section 2 explains that the new language supports the elimination of the common practice of presenting dual theories of recovery (i.e. in negligence and strict liability) to a finder of fact in a failure to warn context. This Court views this development as a welcome departure from the previous, clumsy, formalistic scheme. The practical effect here, then, would be to eliminate Counts I and II of the Plaintiff's Complaint and substitute one count based on a defective product—defective warning—analyzed under the Restatement (Third) of Torts: Products Liability framework.

[7] Only one other United States jurisdiction, the Northern Mariana Islands, has a similar code adopting the American Law Institute's Restatement of law as its "rules of decision." 7 N. MAR. I. CODE § 3401 (2004). *See also, Bolalin v. Guam Publications, Inc.,* Civ. No. 92-0902 (N.M.I. Super. Ct. Dec. 3, 1992) (Opinion and Order), *aff'd*, 4 N.M.I. 176 (N. Mar. I. 1994). Most other jurisdictions view the Restatements as merely an adjunct in their consideration of legal issues. *See generally* Harvey S. Perlman, *The Restatement Process*, 10 KAN. J. L. & PUB. POL'Y 2, 4-6 (2000); *Shawmut Worcester County Bank v. First Am. Bank & Trust*, 731 F. Supp. 57, 62-63 (D. Mass. 1990).

section 4 directs courts to examine first "the restatements" and second, only to the extent not so expressed in a Restatement, the common law as understood and applied in the decisions of the courts of the United States. In spite of this seemingly clear directive, there can be little argument that title 1, section 4 is ambiguous, as the phrase "in the absence of local laws to the contrary," is susceptible to being understood in two or more ways. To date, courts have interpreted "local laws" to include both legislation and common law precedent. *See e.g., Miller v. Christian*, 27 V.I. 363, 367, 958 F.2d 1234, 1237 (3d Cir. 1992); *Skeoch v. Ottley*, 6 V.I. 241, 252, 377 F.2d 804, 810 (3d Cir. 1967); *Moore v. A.H. Riise Gift Shops*, 23 V.I. 227, 234-35, 659 F. Supp. 1417, 1422-23 (D.V.I. 1987). "Local laws", though, can just as easily be interpreted to connote legislation *or* precedent. *See Dunn v. HOVIC*, 28 V.I. 467, 500-02, 1 F.3d 1371, 1391-93 (3d Cir. 1993) (en banc) (Alito, J., concurring) (suggesting that courts should turn to the Restatements as the expression of the common law, in the "absence of a relevant statutory provision"); *Co-Build Co., Inc. v. V.I. Refinery Corp.*, 15 V.I. 528, 533, 570 F.2d 492, 494-95 (3d Cir. 1978) (courts should turn to the Restatements, "when no precedents relate specifically to the adjudication of a Virgin Islands dispute").

Because this dispute ultimately turns on the interpretation of title 1, section 4, the Court must resort to rules of statutory construction. The guiding principle of statutory construction provides that when determining the meaning of a statute, words and phrases are to be read within their context and construed according to the common and approved usage of the English language. 1 V.I.C. § 42. Where the language of a statute is ambiguous when read as a whole, however, courts should turn to both intrinsic and extrinsic aids to elicit the legislative intent. *See generally* 2A NORMAN J. SINGER, SUTHERLAND STAT. CONST. §§ 45.02 at 14 (6th ed. 2000) [hereinafter "SINGER"] (acknowledging that a statute is ambiguous, if it is susceptible to "being understood by reasonably well-informed persons in either of two or more senses."); 47.01 at 209-10 (intrinsic aids of composition and structure may help discern an ambiguous statute's meaning); 48.01 at 409-11 (extrinsic aids, facts comprising the history of a statute, are also probative of a statute's meaning).

The meaning of "restatements of law" in this context is also ambiguous as it is unclear to which installment of the Restatement local

law must be contrary. No court has ever identified which version of the "restatements of law" was mandated by the Legislature to be applied in disputes, whether the obligation was both continuing and automatically updating, and whether the drafters intended the adoption to be by section, topic, chapter, division or in its entirety. Identifying several possible readings, this Court will consider each approach in turn. In so doing, this Court observes that title 1, section 4 of the Virgin Islands Code is devoid of any traditional legislative history[8] in the Virgin Islands Sessions Laws or otherwise, and thereby acknowledges that discerning what the Legislature intended requires resorting to other extrinsic aids.

## A. Historical Discussion

According to the History comment[9] to title 1, section 4, the current version of the Virgin Islands statute was based on the parallel 1921 Codes of St. Thomas, St. John and St. Croix. Those provisions contained the following language: "[t]he common law of England as adopted and understood in the United States shall be in force in this District, except as modified by this ordinance [code]." 1921 St. C. Code, Title IV, ch. 13, § 6; 1921 St. J. Code, Title IV, ch. 13, § 6; 1921 St. T. Code, Title IV,

---

[8] Titles one through thirty-four of the initial Virgin Islands Code were proposed in Bill 425 and adopted as Act 160 on May 16, 1957. 1957 V.I. SESS. LAWS 20 (Act No. 160). The microfilm containing legislative history between February 28, 1957 and April 13, 1959, however, was lost. Instead, this Court may consult The Preface to the First Edition of the Virgin Islands Code and the referenced history and prior law notes to decipher the intent of the drafters of the Code and provide a historical context. *See* SINGER, *supra,* § 48.11 at 457-58 ("where there is no legislative history ... reports of the [ ] council can be acceptable source of information on legislative intent"); Preface First Edition, *reprinted in* V.I. CODE ANN. tit. 1, Foreword, Preface, Historical Documents, Organic Acts, and U.S. Constitution at ix-x (1995) (preceding V.I. CODE ANN. tit. 1) [hereinafter "Preface"]. The Preface suggests that titles one through thirty-four consisted of a rearrangement and editing of the 1921 Codes of St. Thomas, St. John and St. Croix and an endorsement some uniform acts chosen "to fill in the gaps." Preface, *supra,* at ix. This Preface also documents the process by which a Code Advisory Committee, created by the Secretary of the Interior, discussed and recommended the provisions that were ultimately enacted into law by the Legislature in Act 160. Preface, *supra,* at ix. The Secretary of the Interior was purportedly authorized to arrange for the preparation of a code under section 8(e) of the Revised Organic Act of 1954, which has since been repealed. Preface, *supra,* at ix.

[9] The History comment was inserted by the publisher contemporaneously with the publication of the First Edition of the Virgin Islands Code. *See* Preface, *supra.*

ch. 13, § 6.[10] This language serves as a reminder of the shared origins of the legal systems of the United States and the Virgin Islands as common law jurisdictions. It is also the presumptive scope for the phrase "local law to the contrary," suggesting that drafters of the 1921 Codes contemplated modification by both precedent and statutory law. 1 V.I.C. § 4 History cmt. The prior law note confirms this conclusion when it further indicates that the drafters of title 1, section 4 also considered the previously affected language of the Colonial Law for the Danish West India Islands of November 27, 1863, and the Colonial Law for the Danish West India Islands of April 6, 1906 when formulating title 1, section 4. These provided: "the Common and Statute Law of Denmark shall as hitherto be applicable in the colonies, as more accurately defined by the Laws and Ordinances [of the Colonies]." *Id.* 1 V.I.C. § 4 History cmt. Finally, the source note highlights a rule of decision, *Callwood v. V.I. National Bank*, where the court adopted a particular section of the Restatement, as a logical extension of the 1921 Codes' reliance on United States common law. 3 V.I. 540, 557-58, 221 F.2d 770, 774-775 (3d Cir. 1955);[11] 1 V.I.C. § 4 History cmt.

Viewed collectively, however, this list of historical sources fails to conclusively explain the apparent delegation of the Legislature's lawmaking authority and responsibility[12] to a non-governmental entity, the ALI, in the plain language of title 1, section 4 of the Virgin Islands Code. Where, as an initial matter, according deference to Denmark and the United States was logical because of the colonial relationship, the final step was a far cry from vesting that power in the Danish and United

---

[10] Both section 5 of title 1 of the Virgin Islands Code, generally, and the tables preceding the index, specifically, confirm the replacement of 1921 Codes' Title IV, ch. 13, § 6 with title 1, section 4. 1 V.I.C. § 5(2); V.I. CODE ANN. TABLES (2004). For an application of the corresponding 1921 provisions, see e.g., *In re Gibbons*, 1 V.I. 57, 59 (D.V.I 1924) and *People v. Charles*, 1 V.I. 236, 238 (D.V.I. 1929). The courts in these cases looked to the decisions of England and the United States to help resolve disputes in criminal law.

[11] The earliest reference to the Restatements of Law came in *Callwood v. Kean*, 2 V.I. 526, 189 F.2d 565 (3d Cir. 1951). The Restatements were acknowledged as representing the common law of England as understood in the United States, but were ultimately not applied because at the time the will in dispute was drafted, Danish law was still in force. *Callwood*, 2 V.I. at 542.

[12] This Court recognizes that the ALI does not have the actual authority to draft code, but their purported codification of the common law might have similar practical effects in this jurisdiction depending upon the interpretive approach endorsed by this Court.

States courts. It is this break from the pattern that bears further inquiry and prompts a narrow reading of title 1, section 4.

■ Judge Alito of the Third Circuit, in a concurring opinion, provides further clarification on the reference to the ALI. *Dunn*, 28 V.I. at 500-02, 1 F.3d at 1391-93. According to Judge Alito, title 1, section 4 is not a delegation, but an acknowledgement that the drafters of the code viewed the Restatement as a "presumptively authoritative" expression of the rules of the common law. *Id.* at 501-02, 1392. Title 1, section 4, then, "does not incorporate all of the Restatement provisions in effect in 1957 as if they were actual statutory text." *Id.* at 502, 1392. Reconciling Judge Alito's interpretation with the common thread in these historical notes that the rules of decision and ordinances have been and continue to be the last word on local matters, the Court concludes that title 1, section 4 establishes a two-tiered common law system. Courts must first follow local precedent and second, the majority rules of the common law established by precedent in courts of the United States. So it is in this vein that the Court identifies the meaning of title 1, section 4 of the Virgin Islands Code.

■ There are no less than three plausible interpretations[13] of the Virgin Islands Legislature's adoption of the Restatements as a component of the rules of decision "in the absence of local laws to the contrary." 1 V.I.C. § 4. For the purposes of clarity, the Court names them the following: (1) Newest Restatement, (2) Hybrid, and (3) Original

---

[13] The approach of Judge Alito of the Third Circuit Court of Appeals deserves mentioning. *See Dunn v. HOVIC*, 28 V.I. 467, 500-02, 1 F.3d 1372, 1391-93 (3d Cir. 1993) (en banc) (Alito, J., concurring). In a concurring opinion that dealt with a matter of first impression, Judge Alito briefly discusses both the history of title 1, section 4 and his interpretation of that provision, though he does not suggest which Restatement applied. Judge Alito posits that title 1, section 4 mandates the application of the common law of the United States in the "absence of a relevant statutory provision." *Id.* at 501, 1392. The Restatement plays a limited role in Judge Alito's framework. It is only important to the extent that it summarizes the common law, the "body of rules established by precedent as generally understood and applied in the United States." *Id.* (internal quotations omitted). This approach forecloses a policy-based deviation from the common law majority rule, a freedom typically bestowed upon courts of last resort. *Id.* at 502, 1392. According to Judge Alito, courts in this jurisdiction are precluded from weighing the merits of clear, common law rules. *Id.* Although this Court's reasoning and ultimate interpretation of title 1, section 4—that it mandates courts to apply the common law of the United States under certain circumstances—does not differ markedly from Judge Alito's, it reads "local law to the contrary," to include precedent. *Miller*, 27 V.I. at 367, 958 F.2d at 1237.

Restatement Approaches. All approaches take the position that statutes will prevail over the Restatements where there is conflict. Where these approaches differ, however, is in how they treat judicial precedents that may represent "local law to the contrary" and which version of the Restatement they advocate.

## B. Newest Restatement Approach

First, the Legislature may have intended title 1, section 4 to be self-enacting by automatically adopting the most recent embodiment of the common law, here the Restatement (Third) of Torts: Products Liability[14] and previously, the Restatement (Second) of Torts, in its entirety, while superseding the application of particular Restatement sections in earlier judicial decisions. Although attractive because of the ease of application and the additional clarity often contained in the newer Restatements, this interpretation is vulnerable to attack on several grounds.

This reading is unconvincing because it contravenes the plain language of the statute by ignoring any judicial precedent adopting local law to contrary after the enactment of title 1, section 4 in 1957.[15] Where either the Third Circuit or Appellate Division has judicially adopted the Restatement (Second) of Torts section 402A,[16] that decision is now precedent that must be followed by the Superior Court. By the plain language of title 1, section 4, then, despite the approval of a newer version of the Restatement, the Restatement (Third) of Torts: Products

---

[14] In this division of the Restatement of Torts, there are four chapters, each subdivided into topics, spanning twenty-one sections. The ALI, through the piecemeal approval of this new division, appears to supplant, at least in part, Chapter 14 (Liability of Persons Supplying Chattels for the Use of Others), previously subsumed within the Negligence Division (No. 2) in the Restatement (First) and (Second) of Torts. In addition, it contains some definitional sections which may supersede parts of Chapter 1 of Restatement (First) and (Second) of Torts.

[15] Following this approach might lead to a trial court disregarding the directive of an appellate court. *See e.g., Sunny Isle Shopping Ctr., Inc. v. Xtra Super Food Centers*, 237 F. Supp. 2d 606, 613 (D.V.I. 2002) (applying the Restatement (Second) of Contracts section 356 to a liquidated damages provision, without acknowledging that the Third Circuit had adopted section 339 of the Restatement (First) of Contracts, the previous Restatement on liquidated damages, in *Co-Build Co., Inc. v. V.I. Refinery Corp.*, 15 V.I. 528, 533, 570 F.2d 492, 494-95 (3d Cir. 1978)).

[16] *See e.g., Polius v. Clark Equip. Co.*, 802 F.2d 75, 80 (3d Cir. 1986); *Murray v. Fairbanks Morse*, 610 F.2d 149, 154 (3d Cir. 1979); *Verge v. Ford*, 581 F.2d 384, 386, 16 V.I. 41 (3d Cir. 1978).

Liability should not be applied because there is now local law, at least in part, in the form of precedent to the contrary.[17] 1 V.I.C. § 4.

Similarly, the decision to ignore precedent and apply the newest Restatement may be attacked because in some circumstances, as with the RESTATEMENT (THIRD) OF TORTS: Products Liability Topic 1 (sections 1 through 4), the Restatement does not represent the majority rule, but instead endorses a minority rule favored by legal scholars. *See generally* Ellen Werthemier, *The Third Restatement of Torts: An Unreasonably Dangerous Doctrine*, 28 SUFFOLK U. L. REV. 1235, 1244-45 (1994) (criticizing the Restatement (Third) as the product of scholars who favor defendants). *Varlack v. SWC Caribbean, Inc.* noted that the Legislature employed the Restatement because it "accurately summarize[d] the [rules of the] common law." 13 V.I. 666, 685, 550 F.2d 171, 179-80 (3d Cir. 1977). To accurately summarize the common law, according to the *Varlack* panel, was to advocate the majority rule. 13 V.I. at 680-81, 550 F.2d at 178. To the extent that this is not the case with the Restatement (Third) of Torts: Products Liability, the above rationale advocating the newest Restatement is undercut. In situations where there is no majority rule, in the Restatement or otherwise, courts should apply the soundest rule. *Polius v. Clark Equip. Co.*, 802 F.2d 75, 77 (3d Cir. 1986). By considering both the prevalence and where there is no majority, the soundness of the doctrine, the Third Circuit supplied guidance for discerning what the "rules of the common law" are from the directives to apply "the Restatements of law approved by the [ALI]" and "to the extent not so expressed, as generally understood and applied in the United States[.]"[18] Consequently, this Court does not believe that the Newest Restatement Approach is the one that drafters envisioned.

---

[17] This presumes that there is some significant difference between the two Restatements, as with this case. If the newer Restatement copied the language of an old Restatement, then, the newer Restatement would not be contrary. In fact, adopting the newer Restatement would be consistent. *See e.g., In re Georg's Estate*, 298 F. Supp. 741, 744, 7 V.I. 298 (D.V.I. 1969)

[18] The Court also recognizes that holding that the Legislature intended to grant the ALI power to essentially enact law in the Virgin Islands, as this approach suggests, may subject this provision to collateral attack as an improper delegation to an administrative body without strict guidelines. *See Great Cruz Bay Development Corp. v. V.I. Bd. of Land Use Appeals*, 18 V.I. 536, 541 (D.V.I. 1981). Although this is the weakest challenge, this Court sees little in the language of title 1, section 4 under this approach to

## C. Hybrid Approach

The next approach, a hybrid of the first and last, suggests that title 1, section 4 of the Virgin Islands Code may require the courts to adopt the most recent version of the Restatement unless local law to the contrary, in the form of an earlier, contrary Restatement or other common law rule, has been previously endorsed by the courts. Under this framework, the law would then be an amalgam of statutes, rules of decision adopting particular sections or rules, and where there was no local law to the contrary, the summarization of United States common law embodied in the most recent Restatements. This scheme, however, suffers from some of the same infirmities as the first approach, including the possibility that the newest Restatements endorsed a minority rule. Likewise, this approach may be attacked as contravening the plain language of the text, because to do so would be inserting the word "newest" to modify "restatements." 1 V.I.C. § 4. This characterization cannot be found anywhere in the language of the statute. *Id.*

Aside from the textual concerns, the hybrid approach may be similarly criticized for promoting the interests of convenience over adherence to the law. Mischaracterizations of section 4's mandate in the rubric of "controlling law" aside, courts frequently apply a Restatement in a cursory, rubber-stamp fashion without considering the prevalence of the particular provisions. *See Armstrong v. Armstrong*, 266 F. Supp. 2d 385, 396 n.8 (D.V.I. App. Div. 2003); *Paul v. Electric Ave.*, Civ. No. 1999-055, 2001 U.S. Dist. LEXIS 14261 (D.V.I. App. Div. 2001) (unpublished). *But see Hood v. Hess Oil V.I. Corp.*, 22 V.I. 456, 460 n.4, 650 F. Supp. 678, 680 n.4 (D.V.I. 1986) (providing an example of the proper inquiry). This popular approach oversimplifies a process that requires courts to identify and apply the majority doctrine. That is, where a court cites to title 1, section 4, acknowledges the absence of an endorsement by courts of a particular Restatement provision and subsequently applies the corresponding most recent Restatement, this should not be the end of the inquiry. Though not expressly stated in section 4, according to *Varlack,* there should be some explanation accompanying a court's endorsement. 13 V.I. at 680-81, 550 F.2d at 178. A contrast of these three opinions should illustrate this Court's concerns.

---

suggest that the Virgin Islands Legislature limits the impact of the ALI in any meaningful manner.

In *Paul,* the Appellate Division referenced the newest Restatement provision in dicta, without arguments by the parties or discussion, to affirm a motion for summary judgment. *Paul v. Electric Ave.,* Civ. No. 1999-055, 2001 U.S. Dist. LEXIS 14261. A rationale should be articulated in support for the as yet un-adopted provisions of the ALI's Restatements. Similarly, in *Armstrong,* an explanation should have been supplied for alternating between the Restatement (Third)[19] and (Second) of Property, or at the very least, for the break with the Restatement (First). *Armstrong,* 266 F. Supp. 2d at 396 n.8; *see also, Estate of Savain,* 39 V.I. 77, 80 n.1, 82 (Terr. Ct. 1998) (referencing Restatement (Second) and (Third) of Trusts without explanation).

In contrast, the *Hood* court considered persuasive authority to arrive at its conclusion that the Virgin Islands would adopt a distinction, found in a majority of jurisdictions, between direct and vicarious liability for the negligence of employers of independent contractors. *Hood,* 22 V.I. at 460 n.4, 650 F. Supp. at 680 n.4. *Hood's* brief analysis suggests not only that such inquiries are feasible, but also that they must be an important aspect of this Court's choice of law analysis. This conclusion militates against endorsing the Hybrid Approach, under which such analysis is eschewed.

### D. Original Restatement Approach

As a third approach, the proper reading of title 1, section 4 of the Virgin Islands Code may be that the Legislature advocated the Restatements in existence at the time of its passage in 1957 to lay a foundation for courts to begin crafting decisions while the Legislature took the time necessary to draft the Code for the Virgin Islands. This approach does not suggest that the Restatements "are tantamount to Virgin Islands statutes." *Dunn,* 28 V.I. at 501, 1 F.3d at 1392. Instead, the Restatements were meant to guide judges, as an expression of the common law as it was understood in the United States at that time, in their crafting of the local common law.

Though title 1, section 4 does not so specify, it is likely that the drafters contemplated that the judicial adoption of the Restatements

---

[19] An inquiry into the prevalence of the Second (and Third) Restatement of Property, in light of the break with the Restatement (First) of Property, should be supplied.

would adhere to a minimum doctrinal unit.[20] The Restatements are organized by topic area (e.g. Torts, Agency, etc.), division, (e.g. Negligence), chapter (e.g. Liability of Persons Supplying Chattels for the Use of Others), topic (e.g. Strict Liability), and section (e.g. "Special Liability of Seller of Product for Physical Harm to User or Consumer"). As a practical matter, the minimum doctrinal unit must be a topic since a particular section could not be well understood or applied without the coordinate sections. Viewed through this lens, then, a court's adoption of a particular section would implicitly result in the adoption of the entire topic.[21] According to this reading, the current law would be some combination of statutes, judicially adopted Restatement topics, and where no courts have spoken, the common law majority rules, first as expressed in the Restatements in existence in 1957 to the extent that they still represent the majority rule, then, as expressed in subsequent versions, with common law precedents from the United States supplying the balance.

This reading is compelling because, among other reasons, it is unlikely that the Legislature contemplated the amending of the Restatements at all, and much less so in the fashion that the ALI did.[22] It

---

[20] The introduction to the Restatement (Third) of Torts: Products Liability is proffered as an example. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY, *Introduction* at 4 (1998). Perhaps anticipating that Courts may misapply the provisions contained therein, the drafters of the Restatement suggest that section 2(b) should not be applied without considering the other parts of the *topic*, "Liability Rules Applicable to Products Generally." The drafters of the Restatement wanted to avoid any disjunctive analysis. It would be similarly improper to adopt previous Restatement provisions on a section-by-section basis.

[21] Of course, this Court is bound to apply the Restatement restrictively, if an appellate court has taken the pains of limiting the adoption of the Restatement to particular provisions, to the exclusion of others. *See Gass v. V.I. Tel. Corp.*, 311 F.3d 237, 241-46, 45 V.I. 649 (3d Cir. 2002).

[22] In 1957, none of the ALI's Restatements of Law had reached their second incarnation. Thus, it is possible that the Legislature may not have contemplated the potential confusion regarding which version of the Restatement to apply. This inference is tempered by the fact that the task of *restating American law* had begun as early as 1952, culminating in the publication of the Restatement (Second) of Agency in 1958. *See* RESTATEMENT (SECOND) OF AGENCY, *Introduction* at vii (1958). At the time of the enactment of title 1, section 4, in 1957, the Restatement (Second) and its potential *restated* or *normative* character was far from a certainty. Patrick J. Borchers, *Courts and the Second Conflicts Restatement: Some Observations and an Empirical Note*, 56 MD. L. REV. 1232, 1234-37 (1997) (during the seventeen years that the ALI worked on the

is also consistent with the *Varlack* characterization of the "rules of common law"—as a summarization of the majority rule—and the delicate balance conceived therein by providing courts with a means for departure when a Restatement no longer represents the majority rule. In addition, this framework precludes the adoption of subsequent Restatements where there is common law precedent. In this case, it advocates adhering to the previously-adopted Restatement (Second) of Torts provisions instead of the Restatement (Third) of Torts, consistent with the language of title 1, section 4. By determining that the earliest Restatements should be the base, this scheme cloaks judges with the discretion to deviate when identifying the majority rule, mandating the application of newer Restatements only where they represent the majority rule.

Finally, this approach helps resolve how courts in the past transitioned from the Restatement (First) of Torts to the Restatement (Second) of Torts. First, *Varlack* provides a partial explanation. In the *Varlack* opinion, the Third Circuit recognized that since the Restatement (First) of Torts was silent on the particular area of interest, courts in the Virgin Islands were correct to look to the Restatement (Second) of Torts. 550 F.2d at 178, 13 V.I. 666.

Second, the language of the statute helps explain why most courts in the Virgin Islands today uniformly apply the Restatement (Second) of Torts, despite the preeminence of Restatement (First) of Torts at the time of title 1, section 4's passage: it is because of the legislatively-provided opportunity for departure in section 4. *See Action Eng'g v. Martin Marietta Aluminum*, 670 F.2d 456, 459-60 (3d Cir. 1982) (eschewing strict adherence to Restatement (First) when it no longer accurately summarized the common law). The current judicial landscape is generally not the result of a failure to follow precedent. *But see Sunny Isle Shopping Ctr., Inc. v. Xtra Super Food Centers*, 237 F. Supp. 2d

---

Restatement, the goals shifted from restating the law, an unachievable task, to advocating flexible, normative positions). The Introductions to the Restatements (Second) provide additional support as to the difference in goals between the Restatements (First) and Restatement (Second). *See generally* RESTATEMENT (SECOND) OF CONFLICTS OF LAW, *Introduction* at viii (1971) (acknowledging that the Restatement (Second) was less dogmatic and more flexible than Restatement (First)). Thus, attributing either of the previous approaches to the Legislature seems inconsistent with the prevailing understanding of the Restatements at the time of the enactment of title 1, section 4 in 1957.

606, 613 (D.V.I. 2002) (applying the Restatement (Second) provision on liquidated damages, despite an earlier Third Circuit decision applying the Restatement (First)). Because of the limited quantity of published appellate decisions involving the Restatements, this Court has not found many occasions where an appellate court applied the Restatement (First) and lower courts subsequently applied the Restatement (Second) without a directive.[23] This leads the Court to conclude that the transition to newer Restatements has occurred through the piecemeal adoption by trial courts (where no local law was to the contrary) or by appellate panels, persuaded that such Restatements were more accurate summaries of the common law and thereby substituting the corresponding newer provisions to overrule precedent.

### E. Chosen Framework

■ Ultimately, this Court is persuaded that the Original Restatement Approach is most faithful to the language of the enactment and therefore endorses it by applying it to the facts of this case. This Court concludes that title 1, section 4's reference to the "restatements" refers to the Restatement in existence at the time of its enactment in 1957 and reflects an intent to fill a void until such a time when the Legislature codified law or the judicial branch confirmed the propriety of particular Restatements. Thus, title 1, section 4 mandates that absent statutory or precedential law to the contrary, courts in the Virgin Islands must apply the current common law majority rule, first, as expressed. in the Restatement in existence at the time of its enactment and second, to the extent not so expressed, as in more recent versions of the Restatement; failing that, courts shall resort to the majority common law rules as generally understood and applied in the United States. This second inquiry should begin with the consideration of whether more recent versions of the Restatement now reflect the majority rule, before resorting to common law precedents.

This conclusion is bolstered by the previous historical discussion. Under Danish colonial law, in certain circumstances, the local courts

---

[23] *Compare Fullford v. Rawls*, 1986 U.S. Dist. LEXIS 16640 (D.V.I. App. Div. 1986) (unpublished), *aff'd* 838 F.2d 460 (3d Cir. 1987) (table), *and Co-Build Co., Inc. v. Virgin Islands Refinery Corp.*, 15 V.I. at 533, 570 F.2d at 494-95 (disagreeing as to which Restatement should serve as the source of substantive law in the Virgin Islands for liquidated damages).

were directed to follow the common law of Denmark. After the transfer, a similar mandate was imposed on local courts with respect to United States common law. Presumably, this was problematic because there was no unitary common law of the United States, but rather, it varied between states. Subsequent judicial opinions recognized the Restatements as embodying that United States common law. The Legislature, cognizant of these judicial decisions, recognized that the Restatements might serve as better guidance and adopted title 1, section 4. At the time the Restatement (First) was promulgated, it attempted to reflect the United States common law as it then existed. *See Lorah v. Luppold Roofing Co., Inc.*, 424 Pa. Super. 439, 622 A.2d 1383, 1387 n.3 (1993) (citing W. Noel Keyes, *The Restatement (Second): Its Misleading Quality and a Proposal for Its Amelioration*, 13 PEPP. L. REV. 23 (1985) for the proposition that the Restatement (Second) no longer merely summarized the common law). While it is unclear whether the Legislature contemplated future versions of the Restatement, it is unlikely that the Legislature would have foreseen that in the future the Restatements would reflect not only the common law of the United States as it evolved, but also how the drafters of the Restatement perceived it ought to be. *See* HISTORY OF THE RESTATEMENT (1945) ("[The Restatement] is a picture of present law expressed by foremost members of the profession"). *See also* Patrick J. Borchers, *Courts and the Second Conflicts Restatement: Some Observations and an Empirical Note*, 56 MD. L. REV. 1232, 1234-37 (1997) (conveying that the Restatement (First) of Conflicts restated American law as it then existed and that although the drafters of Restatement (Second) had similar goals, such a venture proved too difficult; the Second Restatement became an "amalgamation of different conflicts approaches, producing a document of a distinctly normative character.")

Since the Restatement (First) is the baseline for this jurisdiction's rules of decision as the primary expression of the majority rules of the common law, it is important to clarify what allowances exist in this framework for applying other installments of the Restatement or the majority rules followed by the courts of the United States.[24] First, the

---

[24] In situations where the Restatement (First) was silent, majority rules would be supplied by the newer Restatements or the rules of the common law as understood and applied in the Courts of the United States.

framework presupposes that a legislative enactment can affect the directive to apply the Restatement (First). Such legislative enactments may abandon or codify the principles of the Restatement (First). A prime example of the former is the Legislature's adoption of the comparative negligence statute, precluding the contributory negligence doctrine, prevalent in the Restatement (First) of Torts, from serving as a bar to recovery in the Virgin Islands. *See generally* V.I. CODE ANN. tit. 5, § 1451 (1997); RESTATEMENT (FIRST) OF TORTS § 467 (preventing recovery by negligent plaintiff from an otherwise liable defendant). Section 1451, when enacted, represented "local law to the contrary" and had to be applied in lieu of the Restatement (First) of Torts.[25] Alternatively, a statute that affirmatively codifies, for example, a majority principle in the Restatement (First) of Torts, though important for its reinforcement, is not within the rubric of title 1, section 4, since it is not "local law to the contrary." Such a statute is critical for the role it will play in limiting the second means of deviating from the Restatement (First), through case law. Because a common law majority rule is an evolving concept, the Court notes that it might be precluded from applying a current majority rule under title 1, section 4, should the previous enactment no longer codify the majority rule, as it would now constitute *local law to the contrary* of the majority rule.

Case law may also displace the majority rules contained in the Restatement (First). Again, as with legislation, there is a dichotomy between case law that abandons the Restatement (First) and that which endorses it. Courts are well within their prerogatives to determine the Restatement (First) no longer represents the majority rule or where there is no majority rule, the most sound rule. *Polius v. Clark Equip. Co.*, 802 F.2d at 77; *Varlack*, 13 V.I. at 680-81, 550 F.2d at 178; *Action Eng'g*, 670 F.2d at 459-60. In fact, there is an express statutory grant of authority for the departure in such circumstances, when "to the extent *not so expressed*, [courts shall apply the rules of the common law] as generally understood and applied in the United States." 1 V.I.C. § 4

---

[25] Today, since most jurisdictions employ some form of comparative fault, section 1451 of title 5 is a majority rule. At the time of it enactment, however, comparative negligence was an emerging doctrine and was contrary to the common law as summarized in the Restatement (First) of Torts. *See* 1973 V.I. SESS. LAWS 10 (Act No. 3382) (entitled "To Add a New Chapter 99 to Title 5, Virgin Islands Code, To Alter the Doctrine of Contributory Negligence with a Comparative Negligence Standard").

(emphasis added);[26] *Dunn*, 28 V.I. at 502, 1 F.3d at 1393. Alternatively, in situations where a court endorses a Restatement (First) provision, that decision, like legislation in affirmation, falls outside the ambit of title 1, section 4. *See e.g., Co-Build Co.*, 15 V.I. at 533, 570 F.2d at 494-95 (adopting section 339 of the Restatement (First) of Contracts, relating to liquidated damages). Even so, the Court notes that the current framework creates a somewhat anomalous result in the event that a previously-adopted majority rule ceases to be a majority rule. This, again, is due to the evolving nature of common law majority rules. In these circum-stances, the previous adoption of an earlier restatement or majority rule of the courts of the United States now constitutes local law to the contrary of the current majority rule. This local law prevents the application of the current majority rule by the language of title 1, section 4.

▮ Adhering to this framework ensures that the Virgin Islands do not operate in such a disparate fashion from other United States jurisdictions. Courts in the Virgin Islands must apply the majority rule, unless the Legislature or appellate courts have adopted positions that are to the contrary. Whereas other jurisdictions have a long history of common law and use the Restatements as mere adjuncts to guide their jurisprudence, the Virgin Islands should do the same to the extent possible. For the Virgin Islands, with the Restatement (First) as a baseline for expression of the common law, newer installments should be applied only as adjuncts, where they reflect a change in the majority rule. This Court now turns its attention to the facts of this case.

### F. Application

▮ To recount briefly, on pending motion, Plaintiffs and Shell dispute the viability of the sophisticated intermediary affirmative defense as it applies to failure to warn causes of action in negligence and strict liability contexts. The defense bars recovery where a defendant has adequately warned a sophisticated intermediary and reasonably relied on

---

[26] Often, courts cite to title 1, section 4 when choosing to apply provisions from Restatements other than the Restatement (First). *See e.g., Estate of Savain*, 39 V.I. 77, 80 n. 1, 82 (Terr. Ct. 1998). While these conclusions may have been correct in identifying the majority rule, they should have been accompanied by an explanation for that departure. It is noteworthy that this language also provides for a departure when the Restatement is silent on the particular topic.

the conveyance of that warning to the ultimate users of the product. RESTATEMENT (FIRST) OF TORTS § 388 cmt. 1 (1934); RESTATEMENT (SECOND) OF TORTS § 388 cmt. n. Failure to warn causes of action may be read to arise under the Restatement (First) and (Second) of Torts section 388(c) according to their express language and under the RESTATEMENT (SECOND) OF TORTS [§ ]402A(1) implicitly. *See generally Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1317-18 (7th Cir. 1983); *Sterling Drug, Inc. v. Yarrow*, 408 F.2d 978, 992-93 (8th Cir. 1969). Section 388 was in existence at the time of title 1, section 4's enactment, though it has since been modified in part. Since the language of section 388 in the Restatement (First) and (Second) of Torts is nearly identical,[27] and the sophisticated user defense found in comment 1 to section 388 of the Restatement (First) of Torts and comment n to section 388 of the Restatement (Second) of Torts is the majority rule,[28] the Court will now apply RESTATEMENT (FIRST) OF TORTS topic 1: Rules Applicable to All Suppliers of Chapter 14 for negligent failure to warn actions according to its interpretation of title 1, section 4.

In contrast, the RESTATEMENT (FIRST) OF TORTS, Chapter 14, Liability of Persons Supplying Chattels for Use of Others, did not contain any strict products liability. Only with the drafting of the Restatement (Second) of Torts did the ALI overhaul the products liability provisions to include the section relevant to the instant matter. Among the changes, section 402A was added as a part of the new strict liability topic 5 in Chapter 14. Since then, section 402A garnered widespread acceptance, including the adoption by courts in this jurisdiction. *See generally Polius*, 802 F.2d at 86-87; *Verge v. Ford*, 581 F.2d 384, 386, 16 V.I. 41 (3d Cir. 1978).[29]

---

[27] The only differences are the following. Parts of the comments to the RESTATEMENT (FIRST) OF TORTS section 388 were assigned new letters, resulting in a different lettering system in the Restatement (Second) of Torts. In addition, a caveat that previously existed in the Restatement (First) of Torts has been removed.

[28] The discussion in note 37 supports the conclusion that this is a majority rule.

[29] Numerous non-binding trial court decisions, have applied section 402A, including in a failure to warn context. *See generally Poole v. Ford Motor Co.*, 17 V.I. 354, 357 (D.V.I. 1980); *Battiste v. St. Thomas Diving Club, Inc.*, 15 V.I. 184, 189 (D.V.I. 1979). RESTATEMENT (SECOND) OF TORTS section 388 has also been applied by the District Court. *Viger v. Commercial Ins. Co. of Newark*, 19 V.I. 40, 42 (D.V.I. 1982) *rev'd on other grounds* by 707 F.2d 769 (3d Cir. 1983).

■ Accordingly, it is apparent that the RESTATEMENT (FIRST) OF TORTS section 388 and the RESTATEMENT (SECOND) OF TORTS section 402A supply the substantive law for products liability actions in this jurisdiction. Following the rubric of the chosen approach, the Restatement (Third) of Torts does not apply because majority rules are found in the RESTATEMENT (FIRST) OF TORTS Section 388(c) comment 1 and RESTATEMENT (SECOND) OF TORTS section 402A(1). Furthermore, since there is binding precedent, the RESTATEMENT (SECOND) OF TORTS Section 402A must be applied, unless appellate courts adopt the Restatement (Third) of Torts. To date, only two courts in this jurisdiction have applied the RESTATEMENT (THIRD) OF TORTS section 1, the corresponding products liability section. *See Paul v. Electric Ave.*, Civ. No. 1999-055, 2001 U.S. Dist. LEXIS 14261 (D.V.I. App. Div. 2001) (unpublished); *Hamlet v. Oliver Exterminating Inc.*, 44 V.I. 99 (Terr. Ct. 2001). This Court is not persuaded by either application.

In *Paul,* the Appellate Division reviewed a Territorial Court decision granting a motion for summary judgment in favor of a defendant, because the plaintiff could not prove that the defendant manufactured the defective lamps at the center of the dispute. 2001 U.S. Dist. LEXIS 14261. In affirming on different grounds, the court referenced, without explanation, the Restatement (Third) of Torts: Products Liability as the source for general strict liability language. *Paul,* 2001 U.S. Dist. LEXIS 14261. Of particular import, the applicability of the Restatement (Third) of Torts was not raised by either party by motion at the trial level or on brief before the Appellate Division. Nor was the determination of applicable law central to the court's holding, as the motion for summary judgment turned on the sufficiency of evidence. 2001 U.S. Dist. LEXIS 14261. Consequently, absent an explanation for adopting the newer Restatement, the Court need not follow the *Paul* court, as the treatment of the Restatements was mere dicta. Even if it were part of the holding, however, this is an unpublished opinion without precedential value.

Similarly, in the *Hamlet* case, the decision by the Territorial Court to apply RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY section 1 is also dicta. In the *Hamlet* opinion, the court expressly relies upon the *Paul* decision to justify its application of the Restatement (Third) of Torts: Products Liability. *Hamlet,* 44 V.I. at 110. As discussed, the Court does not find Paul's application of the Restatement (Third) persuasive. Lending credence to this Court's hesitation, the *Hamlet* court applied

both versions of the Restatement to the facts before it, arriving at the same result. *Hamlet,* 44 V.I. at 111-12. The *Hamlet* application of the Restatement (Third), then, like *Paul,* was not outcome-determinative and consequently is also dicta. *Id.*

While the Superior Court recognizes the merits of adopting the RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY topic 1 it will refrain from applying this topic until the Legislature or appellate courts supply such a directive. Having determined that the specific topics contained in the Restatement (First) and (Second) of Torts are the law through its adoption by appellate courts and/or as the majority rules in adherence to *Varlack,* this Court must apply it despite a clearer test enunciated in the Restatement (Third) of Torts. Since the appellate judiciary has "spoken" on this matter, it is not the place of this Court to deviate. This Court is bound to follow precedent. *Polius,* 802 F.2d at 80; *Murray v. Fairbanks Morse,* 610 F.2d 149, 163 (3d Cir. 1979).

## IV. APPLICATION OF SUMMARY JUDGMENT

Defendant Shell moved for summary judgment on four counts of the Plaintiffs' Complaint. As to Counts III and IV, this Court finds Shell's conduct fails to reflect the requisite level of intent for such causes of action to stand. Summary judgment will be granted. For Counts I and II, however, there exists a genuine issue of material fact as to whether Shell has established the elements of the sophisticated intermediary defense, and thus, summary judgment is denied.

### A. Count III: Battery

To establish a prima facie case for harmful-contact battery, Plaintiffs must assert sufficient evidence to satisfy the elements embodied in the RESTATEMENT (FIRST) OF TORTS § 13 (1934).[30] A

---

[30] Section 13 provides:

An act which, directly or indirectly, is the legal cause of a harmful contact with another's person makes the actor liable to the other, if

(a) the act is done with the *intention* of bringing about a harmful or offensive contact or an apprehension thereof to the other or a third person, and

(b) the contact is not consented to by the other or the other's consent thereto is procured by fraud or duress, and

(c) the contact is not otherwise privileged.

RESTATEMENT (FIRST) OF TORTS § 13 (1934) (emphasis added)

harmful contact, such as an exposure to a toxic substance, alone, will not be enough for legal cause, without the corresponding intent for that contact or the apprehension of that contact. *Id.*

 Without expressly contesting the existence of such a contact, Shell vigorously contends that the Plaintiffs cannot establish on this record the intent element of a battery claim. The Court agrees. In their Complaint, the Plaintiffs allege that exposing employees to inherently dangerous toxic substances amounted to battery.[31] The Plaintiffs' responsive pleadings on this matter do not expand upon the naked allegation of intentional misconduct contained in Count III of the Complaint. Despite being raised in Shell's initial Motion for Summary Judgment, the Motion for Summary Judgment on Count III was not satisfactorily rebutted by the Plaintiffs in either their opposition or supplementary responsive memoranda. Plaintiffs merely challenge Shell's interpretation that the Case Management Order limits the availability of causes of action against non-premise defendants, a matter wholly collateral to the Plaintiffs' burden of proof with regards to intent.[32] The Plaintiffs failed to supply any factual basis for their assertion that any contact by Shell was intentional. Therefore, the Plaintiffs have not carried their burden to establish the existence of every element. Summary judgment in favor of Defendant as to Count III (Battery) must therefore be granted.

### B. Count IV: Fraudulent Concealment

 Similarly, a cause of action for fraudulent concealment cannot be maintained. The touchstones for fraudulent concealment are (1) the existence of a defendant's affirmative steps to conceal the wrongful conduct and (2) actual concealment. *Simmons v. Martinez*, 45 V.I. 278, 284-85 (Terr. Ct. 2003) (referencing *Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773 (3d Cir. 2001)); RESTATEMENT (FIRST) OF TORTS § 550 (1938).[33]

---

[31] (Pls.' Compl. at 12.)

[32] (Pls.' Resp. to Def. Shell Oil Co.'s Mot. For Summ. J. (I) at 5-6.)

[33] The section provides:

One party to a business transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other as though he had stated the nonexistence of the matter which the other was thus prevented from discovering.

■ The Plaintiffs' Complaint suggests that the dangers and risks of exposure to toxic substances were intentionally concealed from the employees.[34] Yet, the bald assertions in the Complaint do not constitute evidence. As Shell claims, there are no facts in the record to suggest any affirmative concealment. Any failure to convey the true health risks associated with catalyst, if such a failure existed, was not done intentionally. The Court finds no genuine issue of material fact and thus summary judgment in favor of Defendant on Count IV must be granted.

### C. Counts I and II: The Applicability of the Sophisticated Intermediary Defense

The Motion presents a closer question with respect to Counts I and II. For the purposes of this discussion, this Court assumes that Shell failed to directly warn Plaintiffs of the dangers of its catalyst products. The main inquiry is whether the sophisticated intermediary defense operates to shield Shell from liability under Counts I and II of the Plaintiffs' Complaint despite this failure. This inquiry, then, turns on whether Shell had a duty to directly warn Plaintiffs.

■ Under the Restatement (First) of Torts and Restatement (Second) of Torts, causes of action for failure to warn exist in sections 388 and 402A, respectively, as alternative theories of recovery.[35] These sections are the law in the Virgin Islands by virtue of prevalence and in the case of section 402A, its adoption in the cases discussed earlier. *Polius*, 802 F.2d at 80. However, there is no binding precedent on the applicability of sophisticated intermediary affirmative defense as enunciated in comment l of section 388. Therefore, this is a case of first impression. Since much of the case law concerns the RESTATEMENT (SECOND) OF TORTS section 388, and the Restatement (First) of Torts is virtually identical, the Court will apply the corresponding rationale by analogy. Shell directs the Court to two decisions where the District Court of the United States Virgin Islands acknowledged the propriety of a supplier's affirmative defense to a failure to warn.[36] *See Garcia-Guzman v. Ingersoll Rand Co.*, Civ. No.

---

RESTATEMENT (FIRST) OF TORTS § 550.

[34] (Pls.' Compl. at 13.)

[35] The language of these provisions may be found in footnote 6. Causes of action may sound in negligence and in strict liability.

[36] Shell asserts it is entitled to the "sophisticated user defense," yet it appears that Shell was advocating the adoption of the sophisticated intermediary defense. The sophisticated

1998-139, at *13 (D.V.I. Feb. 10, 2003) (unpublished); *Martin v. S.C. Johnson & Sons, Inc.*, Civ. No. 1991-347, 1996 U.S. Dist. LEXIS 19722 (D.V.I.), *aff'd*, 107 F.3d 7 (3d Cir. 1997) (affirmed without opinion and is non-precedential). Finding those decisions and the growing trend of the defense's availability in numerous jurisdictions[37] persuasive, this

---

user defense only applies in situations where the ultimate user, here the Plaintiffs, actually possessed "special knowledge, sophistication, or expertise in relation to the product." 63A AM. JUR. 2D *Products Liability* § 1163 (1997); *Mozeke v. Int'l Paper Co.*, 933 F.2d 1293, 1297-98 (5th Cir. 1991). The threshold inquiry for a sophisticated user in this context turns on user's familiarity and extensive experience with the product. *Duncan v. Louisiana Power & Light Co.*, 532 So. 2d 968, 971-72 (La. Ct. App. 1988). Shell has made no such argument regarding the Plaintiffs; instead, Shell focuses exclusively on the sophistication and knowledge of HOVIC. The Court looks to the substance of Shell's argument over its form. In differentiating between the two, this Court acknowledges that the sophisticated intermediary defense has also been termed the "sophisticated purchaser defense," the "knowledgeable intermediary defense," and the "knowledgeable purchaser defense." *See generally In re Asbestos Litigation (Mergenthaler)*, 542 A.2d 1205, (Del. Super. Ct. 1986); *Dole Food Co., Inc. v. North Carolina Foam Indus. Inc.*, 188 Ariz. 298, 935 P.2d 876 (Ct. App. 1996); *Smith v. Walker C. Best, Inc.*, 927 F.2d 736, 739-40 (3d Cir. 1990). While these defenses are for this Court's purposes the same, the learned intermediary and bulk supplier defenses are conceptually distinct. *See* 63A AM. JUR. 2D *Products Liability* § 1195 (1997); 63A AM. JUR. 2D *Products Liability* § 1200-14 (1997); 63A AM. JUR. 2D *Products Liability* § 1198 (1997). Consequently, the learned intermediary and bulk supplier defenses will not receive any treatment in this opinion.

[37] Jurisdictions adopting the "sophisticated intermediary" defense include: Indiana, Louisiana, Michigan, Montana, Maryland, Virginia, Arizona, Delaware, and Minnesota. *See e.g., First Nat. Bank and Trust Corp. v. American Eurocopter Corp.*, 378 F.3d 682 (7th Cir. 2004); *Swope v. Columbian Chemicals Co.*, 281 F.3d 185 (5th Cir. 2002); *Rusin v. Glendale Optical Company, Inc.*, 805 F.2d 650 (6th Cir. 1986); *Higgins v. E.I. Dupont de Nemours & Co., Inc.*, 671 F. Supp. 1055 (D. Md. 1987), *aff'd*, 863 F.2d 1162 (4th Cir. 1988); *Goodbar v. Whitehead Bros.*, 591 F. Supp. 552 (W.D. Va. 1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985); *Dole Food Co., Inc. v. North Carolina Foam Indus. Inc.*, 188 Ariz. 298, 935 P.2d 876 (Ct. App. 1996); *In re Asbestos Litigation (Mergenthaler)*, 542 A.2d 1205 (Del. Super. Ct. 1986); *Gray v. Badger Mining Corp.*, 676 N.W.2d 268 (Minn. 2004); *Phillips v. A.P. Green Refractories Co.*, 428 Pa. Super. 167, 630 A.2d 874 (1993) *aff'd sub nom. Phillips v. A-Best Products Co.*, 542 Pa. 124, 665 A.2d 1167 (1995).

The "sophisticated user" defense has garnered more widespread approval. The following jurisdictions have acknowledged the propriety of the defense, in at least some form: Iowa, Louisiana, Ohio, Virginia, Montana, Nevada, Kansas, Arizona, Delaware, Idaho, Indiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New Jersey, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Washington and Wisconsin. *See e.g., Bergfeld v. Unimin Corp.*, 319 F.3d 350 (8th Cir. 2003); *Swope v. Columbian Chemicals Co.*, 281 F.3d 185 (5th Cir. 2002); *Adkins v. GAF Corp.*, 923 F.2d 1225 (6th

Court will apply the sophisticated intermediary defense in this case, potentially barring recovery when a defendant has adequately warned an intermediary and has reasonably relied on the intermediary to communicate the warning to the ultimate user.

 Manufacturers, suppliers and sellers generally owe a duty to warn foreseeable users of known dangers inherent in their products. RESTATEMENT (FIRST) OF TORTS § 388 cmt. j. This duty does not extend, however, to easily discoverable and obvious dangers, which "a mere casual looking over will disclose."[38] RESTATEMENT (FIRST) OF TORTS § 388 cmt. i. Shell posits that under the sophisticated intermediary defense, its duty to warn foreseeable users, like the Plaintiff employees, was discharged by providing adequate and explicit warnings to the intermediary (HOVIC) and reasonably relying upon that intermediary to convey those warnings to the ultimate users (Plaintiff employees). *See* RESTATEMENT (FIRST) OF TORTS § 388 cmt. l. This forms the basis of the sophisticated intermediary defense, a corollary to the sophisticated user defense, as articulated in section 388, comment l, of the Restatement (First) of Torts. The Court is mindful that a duty to warn is still owed to

---

Cir. 1991); *Willis v. Raymark Indus., Inc.*, 905 F.2d 793 (4th Cir. 1990); *Jacobson v. Colorado Fuel and Iron Corporation*, 409 F.2d 1263 (9th Cir. 1969); *Forest v. E.I. DuPont de Nemours and Co.*, 791 F. Supp. 1460 (D. Nev. 1992); *Mason v. Texaco, Inc.*, 741 F. Supp. 1472 (D. Kan. 1990); *Dole Food Co., Inc. v. North Carolina Foam Indus. Inc.*, 188 Ariz. 298, 935 P.2d 876 (Ct. App. 1996); *In re Asbestos Litigation (Mergenthaler)*, 542 A.2d 1205 (Del. Super. Ct. 1986); *Sliman v. Aluminum Co. of America*, 112 Idaho 277, 731 P.2d 1267 (1986); *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155 (Ind. Ct. App. 1997); *Kennedy v. Mobay Corp.*, 84 Md. App. 397, 579 A.2d 1191 (Ct. Spec. App. 1990); *aff'd*, 325 Md. 385, 601 A.2d 123 (1992); *Hoffman v. Houghton Chemical Corp.*, 434 Mass. 624, 751 N.E.2d 848 (2001); *Portelli v. I.R. Const. Products Co., Inc.*, 218 Mich. App. 591, 554 N.W.2d 591 (Ct. App. 1996); *Gray v. Badger Mining Corp.*, 676 N.W.2d 268 (Minn. 2004); *Swan v. I.P., Inc.*, 613 So. 2d 846 (Miss. 1993); *McGarvey v. G.I. Joe Septic Serv., Inc.*, 293 N.J. Super. 129, 679 A.2d 733 (App. Div. 1996); *Phillips v. A.P. Green Refractories Co.*, 428 Pa. Super. 167, 630 A.2d 874 (1993) *aff'd sub nom. Phillips v. A-Best Products Co.*, 542 Pa. 124, 665 A.2d 1167 (1995); *Bragg v. Hi-Ranger, Inc.*, 319 S.C. 531, 462 S.E.2d 321 (Ct. App. 1995); *Whitehead v. Dycho Company*, 775 S.W.2d 593 (Tenn. 1989); *Humble Sand & Gravel, Inc. v. Gomez*, 47 Tex. Sup. Ct. J. 1214, 146 S.W.3d 170 (2004); *House v. Armour of Am., Inc.*, 886 P.2d 542 (Utah Ct. App. 1994), *aff'd*, 929 P.2d 340 (Utah 1996); *Reed v. Pennwalt Corp.*, 22 Wash. App. 718, 591 P.2d 478 (Wash. Ct. App. 1979); *Haase · v. Badger Mining Corp.*, 266 Wis. 2d 970, 669 N.W.2d 737 (Ct. App. 2003).

[38] The duty to warn may still exist if such a casual inspection is not likely to occur. RESTATEMENT (FIRST) OF TORTS § 388 cmt. i.

Plaintiffs. That duty to warn has been assumed by the sophisticated intermediary, and if the warning is not furnished in lieu of an explicit notice by suppliers to ultimate users, the breach may give rise to liability for the intermediary.[39] This Court also recognizes that even where a duty to warn has been assumed by the sophisticated intermediary, the supplier may yet be liable if the reliance on the intermediary was unreasonable. RESTATEMENT (FIRST) OF TORTS § 388 cmt. l.

The sophisticated intermediary defense assesses Shell's reasonableness in relying on HOVIC to convey adequate warnings. Whether a supplier's reliance on an intermediary was reasonable turns on the application of a multi-factor balancing test, embodied in comment 1, of RESTATEMENT (FIRST) OF TORTS section 388.[40] This test considers the following factors:

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that [it] directly warn all users.

*Smith v. Walker C. Best, Inc.*, 927 F.2d 736, 739-40 (3d Cir. 1990); *Goodbar v. Whitehead Bros.*, 591 F. Supp. 552, 561 (W.D. Va. 1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985) (numbering added). If the reliance is reasonable, Shell's duty to warn employees is discharged by warning HOVIC. At the most basic level, then, this test considers "whether [Shell's] method gives a reasonable assurance that

---

[39] This defense has its foundation firmly rooted in the principles of pragmatism and convenience, such that shifting the duty to an intermediary with greater access to the ultimate users increases the likelihood that the warning will be effectively conveyed and sufficiently tailored to the intended audience.

[40] Another difference between the Restatements exists with regards to the reasonableness inquiry. The RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, comment i advocates a slightly different test, though it embodies the same ideals. It considers the following factors:

(1) The gravity of the risks posed by the product,

(2) The likelihood that the intermediary will convey the information to the ultimate user, and

(3) The feasibility and effectiveness of giving a warning directly to the user.

(4) Nature of risks disclosed and their importance in consumer decisions (especially non-obvious and not generally known risks)

the information will reach those whose safety depends upon their having it." RESTATEMENT (FIRST) OF TORTS § 388 cmt. l.

### 1. Nature of Dangerous Condition of the Product

■ Beginning with the first factor, the dangerous condition of the product, the inquiry turns on whether the danger associated with the product is open and obvious or latent. *Goodbar*, 591 F. Supp. at 561. Where the danger is latent, the supplier's reliance on an employer to convey the warning appears less reasonable. Correspondingly, the more open and obvious the danger is, the more reasonable the supplier's reliance on the intermediary.

The product at issue is Shell's catalyst, in fresh and spent forms. Currently, both Plaintiffs and Shell agree that spent catalyst presented a greater risk to handlers than fresh catalyst because of the potential, during the refining process, for the creation of nickel subsulfides and nickel cabonynl, a family of possible carcinogens and a lethal gas.[41] Although there is no information in the record concerning when this difference was discovered, it suffices that such a greater danger was not apparent from a casual inspection. RESTATEMENT (FIRST) OF TORTS § 388 cmt. i. This greater danger was latent and the inaccurate warnings supplied by Shell illustrate this latency. Notwithstanding Shell's argument that its labels should have concerned new catalyst only,[42] the warnings as a whole did not convey the different risks of fresh and spent catalyst. Not only is there no discussion of spent catalyst on any of the labels, but Material Safety Data Sheet version 6655-0,[43] [hereinafter

---

[41] (Willet Dep. at 71:12-25, 73:17-23.)

[42] Shell maintains that the label should only describe the contents of the container, which were fresh not spent catalyst. It also claims that two items are different compounds. The Court need not reach this issue for a determination of the latency of the dangerous condition of the product. In reserving discussion, this Court recognizes that this argument may also bear on the adequacy of Shell's warnings as a whole, discussed in the third factor of this test. As the discussion in factor three will illustrate, if the additional dangers of spent catalyst were highlighted in the MSDS, despite their absence from the labels, it might make the collective warning adequate.

[43] Shell submits that as early as November 15, 1982, during preliminary negotiations, it supplied HOVIC with MSDS version 7050-3, accompanying a letter that discusses cobalt catalyst product number 544. (Willett Dep. Ex. 10, 11.) Based on Shell's sales records, HOVIC should have received at least three additional MSDS, versions 6655-0, 6660-4, and 11590-8, as a result of known sales of catalyst beginning in February 1984. (Willet Dep. Ex. 8; Pls.' Resp. (II), Ex. G.) Yet, none of these MSDS specifically

"MSDS"], describing nickel molybdenum catalyst product number 424, does not specifically highlight the more serious health concerns or additional precautions that must be taken when handling spent catalyst. Instead, it reads, "ALL PRECAUTIONS FOR FRESH CATALYST SHOULD BE OBSERVED FOR SPENT CATALYST AND WASHINGS [of equipment and clothing]."

Such warnings, or their absence, evidence the initially held industry belief that employees exposed to spent catalyst should adhere to the same precautions for exposure to new catalyst. This belief was apparently mistaken. This confusion indicates how latent the dangers of spent catalyst were and supports the conclusion that Shell's reliance may have been unreasonable.

### 2. Use of Product

■ Conversely, the second factor, which evaluates the purpose of use of the product—assessing the fit of the type of use with level of warning—points to the opposite outcome. The Plaintiffs at the HOVIC refinery used the product in a manner that was anticipated, in accordance with a warning tailored to that setting. *See e.g., In re TMJ Implants Products Liability Litigation*, 872 F. Supp. 1019, 1029 (D. Minn. 1995) (finding that the anticipated type of use might dictate different levels of warnings). The *TMJ Implants Products Liability* court found that where the warnings were tailored to an industrial setting, the anticipated type of use was industrial, and consumer uses were expressly warranted against, defendant's reliance on the intermediary to convey the proper consumer-driven warnings was reasonable. *Id.* Specifically, Dupont's Teflon products were only warranted for industrial uses. Dupont communicated to the intermediary that Teflon had not been tested for consumer medical applications and that many additional precautions were required before such applications were advisable. In contrast, where the warnings are tailored to industrial uses, when the supplier knew of the intermediary's consumer setting, a similar reliance would be less reasonable. As a practical matter, the general consuming public knows less about the

---

addressed the more serious risk that spent catalyst posed. The Court notes, however, that nickel carbonyl is referenced in Section VII, *Reactivity,* as a potential byproduct of carbon monoxide and some nickel compounds. (Willett Dep. Ex. 6, 13.) But, there is no indication that nickel carbonyl would more likely be formed with spent catalyst than fresh catalyst.

dangers of industrial products and therefore would be entitled to additional warnings. Here, since the warnings were targeted to the industrial setting and were actually used in such a setting, Shell's reliance may be viewed in a more favorable light.

### 3. Form of Warnings

With the third factor, the form of warnings, courts have taken varied approaches. Within the Restatement, a dichotomy implicitly exists between those articles that carry their own messages through labels or devices and those where the warnings are communicated separately. RESTATEMENT (FIRST) OF TORTS § 388 cmt. l. In certain cases, the inquiry has turned on the intensity of the warning. *McLaughlin v. Mine Safety Appliances Co.*, 11 N.Y.2d 62, 181 N.E.2d 430, 434, 226 N.Y.S.2d 407 (1962) (finding that portion of warning conveyed in small lettering was not likely to be effective and did not act to insulate defendant from liability). Other courts weigh whether the warnings were in a form that can "reasonably be expected to catch the attention" of the intended audience. *Bean v. Baxter Healthcare Corp.*, 965 S.W.2d 656, 664 (Tex. App. 1998) (considering whether a reasonable plastic surgeon would have noticed the warning associated with a breast implant). All these inquiries concentrate on the adequacy of the warnings furnished to an intermediary to communicate the risks associated with the product.

Some courts consider an employer's knowledge of the risks in lieu of this determination. An intermediary's *knowledge* of the risks associated with a product also concerns the adequacy of a warning. An intermediary such as HOVIC is deemed knowledgeable "where either (1) the manufacturer has provided an adequate, explicit warning of such dangers; or (2) where information on the product's dangers is available in the public domain."[44] *Landberg v. Ricoh Int'l*, 892 F. Supp. 938, 943 (E.D. Mich. 1995) (citing *Newson v. Monsanto Co.*, 869 F. Supp. 1255, 1260 (E.D. Mich. 1994)). Not even Shell claims that the dangers of catalyst exposure were so well understood as to be termed "part of the public domain." Instead, Shell argues that its warnings to HOVIC were both adequate and explicit, especially when viewing the labels, MSDS, and bulletins together. The Plaintiffs contest this claim, focusing on the

---

[44] This is a "know" or "should have known" standard. 63A AM. JUR. 2D *Products Liability* § 1195 (1997).

warnings' failure to communicate the risks of spent catalyst. In assessing the explicit and adequate nature of the warnings, the Court pays particular attention to the labels, the MSDS, and the bulletins furnished by Shell to HOVIC during the relevant period.

Allegedly created in compliance with the Occupational Safety and Health Administration [hereinafter "OSHA"] and the Department of Transportation standards, Shell's labels[45] for nickel molybdenum and cobalt molybdenum catalyst and/or catalyst support balls warned of adverse skin reaction and lung damage from repeated and/or excessive exposure to dust particles.[46] For the nickel compounds, the labels further cautioned that such exposure might lead to lung and nasal cancer. In an effort to cast doubt on the adequacy of the warnings, the Plaintiffs argue that the labels were inadequate because they fail to contain: (1) the actual OSHA occupational exposure limits or threshold limit values [hereinafter "TLV"] for the respective compounds, (2) the additional procedure for handling spent catalyst, and (3) where such information may be found, if not within the labels. The Plaintiffs also contend that it is possible that no labels were attached in the first place, because Shell's designated deponent could not definitively testify that they were so affixed, beyond a business practice of so doing.[47]

Addressing these issues in the reverse, this Court recognizes that there is no physical evidence in the record that definitively proves or disproves Shell's purported practice of shipping all catalyst containers with the labels. According to its designated representative, Shell was under regulatory obligations—obligations that it complied with—to ship all materials with labels.[48] Yet, merely stating this position, without more, may be an insufficient showing in light of Plaintiffs' response. According to Plaintiffs, the testimony of Shell's designated representative conflicts directly with previous statements by another Shell affiliate's employee.

---

[45] The record contains a series of nine labels that purport to cover the range of all labels affixed to Shell catalyst products delivered to HOVIC during the period of 1982 to 1988. (Willett Dep. at 33:8-12.)

[46] (Willett Dep. Ex. 5-A-5-I.)

[47] (Willett Dep. at 17:8-17.)

[48] (*See* Willett Dep. at 17:8-18:2) (suggesting that both OSHA and the Department of Transportation require goods in interstate commerce to be shipped with labels).

To rebut Shell's assertion, Plaintiffs rely on a sworn affidavit of Jaime Ramirez-Pons in the case of *Dominic v. Hess Oil Virgin Islands Corp.*, Dist. Ct. Civ. No. 1984-202 (sworn on August 22, 1986) to suggest that no labels were attached to the 55-gallon drums of catalyst delivered by Shell to HOVIC.[49] Mr. Ramirez-Pons was an employee of Shell Oil Company of Puerto Rico Ltd., an entity distinct from the named defendant in this matter, Shell Oil Company. That affidavit provides that Shell Oil Company of Puerto Rico labeled its Methyl Ethyl Ketone shipments [hereinafter "MEK"], a product packaged from trailers acquired from Productos Quimicos Essos, Inc. and destined for HOVIC, with only the international flammability symbol. It is unclear how or on what grounds such a document would be admissible.

Even if it were admitted, there is nothing in the affidavit to suggest that Shell Oil Company and Shell Oil Company of Puerto Rico had the same practices with respect to labeling. Also absent is evidence that Shell treated manufactured products like catalyst and wholesale products such as MEK, in the same manner. Moreover, the affidavit does not indicate that Shell Oil Company and Shell Oil Company of Puerto Rico, Ltd., were subject to the same regulatory scheme, arising out of interstate commerce. But these problems with Plaintiffs' rationale pale in comparison to the inferential gap that is required to conclude that Shell's containers of catalyst arrived with no labels at all. The Ramirez-Pons affidavit suggests that at least there was some label on the MEK drums. Thus, this Court rejects Plaintiffs' argument that no labels were attached.

Next, this Court addresses Plaintiffs' claims regarding the inadequacy of the warning, assuming that the labels were affixed as Shell contends. While the label may fail to provide information regarding the specific triggering requirement of OSHA's TLVs, it does direct a user to consult additional materials where the TLVs may be found. Beginning with the January 1983 revisions to the labels[50] an octagon appears in the upper right corner, which contains the language:

BE SAFE
READ OUR PRODUCT SAFETY INFORMATION AND PASS IT ON
PRODUCTS LIABILITY LAW REQUIRES IT.

---

[49] (Pls.' Resp. (II), Ex. G.)
[50] The label version is D9720, Rev. 1/83. (Willett Dep. Ex. 5-A.)

This language suggests that additional information related to the product may be found in other materials and that those sources are distinct from the label, as they may be "passed on." Indeed, the MSDS provide information regarding the OSHA TLVs for the active ingredients in the catalysts in Section VI. Viewed together, the MSDS and label adequately convey that a respirator is required when the quantity of the compound in the air exceeds the TLV as stated in the MSDS.

The same cannot be said for the warnings covering the handling of spent catalyst. None of the MSDS that Shell can demonstrate were sent to HOVIC contained information warning of the different risks posed by spent catalyst.[51] Three other MSDS discussed by the parties in depositions—versions 7030-3, 6655-1, and 6655-6[52]—do warn of the more serious health concerns associated with spent catalyst exposure. However, Shell has not proved that any these MSDS were ever delivered to HOVIC. The deponent *presumed* that the first two were sent with a February 9, 1984 letter, as the likely MSDS versions in effect at that time.[53] Yet, version 6655-1 is undated, leaving the Court to accept the deponent at his word or guess as to when it was created.[54] In suggesting that these documents were delivered, the designated Shell representative relied on a business practice of sending an MSDS at least annually; a MSDS would be sent more often if newer versions were generated during the course of a year.[55]

This Court notes, however, that such a delivery sequence is inconsistent with other Shell testimony in the record. The internal inconsistencies concern the purported dates of delivery of the respective MSDS versions. Shell's record suggests that it sent MSDS version 6655, unrevised, to HOVIC on February 27, 1984; revised versions 6655-1, and 6655-6, must have been promulgated sometime later.[56] It is unlikely that a revised version of 6655 would have been sent on February 9, 1984,

---

[51] *See* note 43.

[52] These versions are not in the record but are mentioned during John Willett's deposition testimony. (Willett Dep. at 77:19-78:23, 42:1-25.) Version 6655-6 was finalized in June 1987 and likely distributed soon thereafter. (*Id.* at 42:11-12.) It provides that spent catalyst has been shown to produce positive carcinogenic effects in experimental animals. (*Id.* at 42:21-24.)

[53] (Willett Dep. at 90:7-91:24.)

[54] *Id.*

[55] (Willett Dep. at 94:17-95:4.)

[56] (Willett Dep. at 90, Ex. 8.)

as suggested by Willett. These misgivings were confirmed by analyzing the testimony of an earlier deponent. A review of the Trevino Deposition reveals that the missing attachments to the February 9, 1984 letter were conclusively identified as versions 6655-0 and 7030-1, both of which lacked additional spent catalyst warnings.[57] At best then, based on Shell's records, the MSDS version 6655-1 may have reached HOVIC in March 1984, a month after the first sale/delivery of nearly 60,000 pounds of Shell 424 catalyst.[58] But as with any of these dates, this Court cannot be certain based on this record. More realistically, since there was no proof of such a delivery despite purported recordkeeping, the window of alleged inadequate warning may have spanned a much longer timeframe.

Before determining Shell's warning to be inadequate, however, this Court notes that even if there was a gap in Shell's MSDS coverage relating to spent catalyst, a specific warning in the safety bulletins could bridge it. Yet, the only bulletin that Shell can confirm as sent was Shell Chemical Company's Technical Bulletin, version number 175-80.[59] This bulletin was included in the same mailing as the two deficient MSDS, versions 6655-0 and 7030-1, and similarly fails to address the greater dangers of spent catalyst. An updated bulletin, introduced in the record, did provide warnings regarding spent catalyst, but has no date of delivery.[60]

While many of Shell's warnings governing the adverse consequences of handling catalyst were affixed to the packaging in the form of labels, others were contained in only the MSDS and bulletins, physically separate from Shell's products. To the extent that more important warnings only arrived separately, were less emphasized, or were not targeted to the intended audience of refinery workers this would make Shell's reliance seem less reasonable. Similarly, the collective warnings' failure to communicate the greater danger of spent catalyst weighs heavily against such reliance being reasonable.

### 4. Reliability of Intermediary as Conduit for Warnings

Next, the fourth factor assesses the reliability of the sophisticated intermediary as a conduit in relaying the warnings received from the

---

[57] (Trevino Dep. Ex. 2-D, Willett Dep. at 90:7-91:24.)
[58] (Pls.' Resp. (II), Ex. D.)
[59] (Trevino Dep. Ex. 2-D.)
[60] (Willet Dep. 61:10-16, Ex. 7.)

supplier. *Smith*, 927 F.2d at 740-741. An important component of this inquiry is the intermediary's sophistication, *i.e.*, the intermediary's ability to comprehend the warnings conveyed and to adjust its behavior accordingly. An employer will be considered sophisticated if it (1) possessed a reputation in the industry as a knowledgeable user, (2) conducted studies of the harmfulness of the product, (3) monitored employee health, (4) adopted safety measures or (5) created its own safety department. 63A AM. JUR. 2D *Products Liability* § 1196 (1997) (referencing *Tasca v. GTE Products Corp.*, 175 Mich. App. 617, 438 N.W.2d 625, 629 (1988)). Such factors, this Court acknowledges, are merely illustrative, not exclusive. *Tasca*, 438 N.W.2d at 629.

Although there is no evidence regarding HOVIC's purported reputation as a knowledgeable user, Shell's failure to plead this component is not fatal to establishing the defense. The Court will not go so far as to sanction this failure by taking judicial notice of the size of HOVIC's refinery as an inference for reputation, as Shell recommends.[61] Evidence on this aspect of sophistication is inconclusive. Similarly, there is little support to suggest that HOVIC either conducted studies on the harmfulness of the chemicals or directly monitored employees' health. The record is replete, however, with evidence of a functioning HOVIC safety department, as the parties have identified numerous safety measures propounded in accordance with its authority.[62] These policies suggest that HOVIC had a good grasp of the warnings conveyed by

---

[61] (Def. Shell Oil Co.'s Mot. For Summ. J. at 13, fn. 9.)

[62] HOVIC had the following policies and procedures in force by at least 1980, among others: (1) a safety department monitoring workplace exposures and drafting policy in conjunction therewith; (Hutchins Dep. at 123:2-3; Edgley Dep. at 224:20); (2) a stated policy for the loading and unloading of catalyst that required the use of respiratory equipment; (Edgley Dep. at 217:13-218; Comly Dep. at 125-26); (3) the required issuance of hazardous work permits, signed by all employees and contractors, detailing the vessels, preparation and protective equipment necessary to complete all tasks involving respiratory equipment, including the loading and unloading of catalyst; (Edgley Dep. at 217:14-16, 220:10-22; Comly Dep. at 125:13-21); (4) the mandatory training of contractors and employees for use of respiratory equipment/fresh air equipment provided by HOVIC safety department; (Sagebien Dep. at 141:4 - 142:14; Comly Dep. at 127); and (5) annual inspections of the catalyst exposure levels conducted by safety officials; (Edgley Dep. at 233:1-18.) HOVIC also provided guidance to contractor employees and collaborated directly with contractors regarding safety measures. (Sagebien Dep. at 140, 184:22-25.) Finally, Litwin Corporation employees were subject to HOVIC regulation. (Halevy Dep. at 36:13-22.)

Shell, discussed in the third factor. HOVIC was a sophisticated intermediary.

Independent of the inquiry into HOVIC's sophistication, is an intermediary's ability to communicate the warnings. If HOVIC is "known to be careless or inconsiderate" or Shell had "reason to expect, or at least suspect, that the information will fail to reach those who are to use the chattel and whose safety depends upon their knowledge of its true character," then Shell will have unreasonably relied on HOVIC to convey said warnings. RESTATEMENT (FIRST) OF TORTS § 388 cmt. l. As to this factor, Plaintiffs suggest that there is a presumption that warnings were not conveyed, such that the defendant suppliers must demonstrate their efforts to ensure that warnings were received by the ultimate users. It is instructive that the *Smith* court refused to require suppliers to take such affirmative steps to determine whether a warning was actually conveyed. *Smith*, 927 F.2d at 741. This decision implicitly suggests that evaluating the need for affirmative steps might be more aptly considered under the sixth factor.

Shell contends that the presence of OSHA regulations make the conveyance of warnings by employers mandatory, thereby justifying their blind reliance on HOVIC to convey said warnings.[63] *See* 29 C.F.R. § 1910.1200(b)(1) (2004). This Court need not interpret how the three-part hazard communication OSHA standard applied to HOVIC to determine that it was a reliable conduit for the purposes of this test. HOVIC has admitted in the record that it was subject to the requirements of OSHA and recounted in depositions its attempts at compliance.[64] The record also details HOVIC's safety and hazard communication efforts including policies, safety manuals, training, distribution of work permits and the enforcement of compliance by contractors.

■ Plaintiffs attempt to tip the balance on this factor in their favor by positing that Shell failed to demonstrate due diligence. They suggest that

---

[63] Some courts have found that there should still be an inquiry into the likelihood of transmittal of the warning, notwithstanding the presence of OSHA regulations. *See Kennedy v. Mobay*, 84 Md. App. 397, 579 A.2d 1191, 1202-03 (1991) (citing *Eagle-Picher Indus., Inc. v. Balbos*, 84 Md. App. 10, 578 A.2d 228, 255 (Md. Ct. Spec. App. 1990)). Others have held that a supplier acted reasonably in relying on an employer to convey the warning based on OSHA regulations. *Washington v. Dep't of Transp.*, 8 F.3d 296, 300-01 (5th Cir. 1993).

[64] (Edgley Dep. at 227: 13-16, 228:12-25.)

Shell should have (1) recommended air monitoring for the benefit of bystander employees in the loading zone; (2) requested safety warnings be delivered directly to employees; (3) assessed the expertise, qualifications and education of HOVIC management and employees; (4) reviewed HOVIC training programs and policies; and (5) determined if HOVIC policies were enforced.[65] While the Court concedes that such measures may have been prudent for Shell to employ, it is not necessary that they do so under the reasonable reliance test. These actions, especially in light of HOVIC's purported enforcement[66] in conformity, go beyond the call of Shell's duty to warn HOVIC. Shell had no evidence to suspect that HOVIC was unreliable in conveying the warnings. While Shell's purported presumption that HOVIC was reliable based on reputation may be unconvincing, the fact remains that HOVIC was reliable, in spite of Shell's ignorance to that fact. This factor supports a finding that Shell's reliance was reasonable.

*5. Magnitude of Risk*

The fifth factor speaks to "the magnitude of the risk involved." RESTATEMENT (FIRST) OF TORTS § 388 cmt. l. The calculation of magnitude includes not only "the chance that some harm may result but also the serious or trivial character of the harm which is likely to result." *Id.* This Court realizes that "[d]amage of potentially great severity but lesser likelihood of occurrence may warrant precautions equal to those taken to avoid harm of greater probability but lesser severity." *Dole Food Co., Inc. v. North Carolina Foam Indus. Inc.*, 188 Ariz. 298, 935 P.2d 876, 883 (Ct. App. 1996) (citing *United States v. Carroll Towing*, 159 F.2d 169 (2d Cir. 1947) (Hand, J.)). Both parties agree that the risks to employees' health from repeated and excessive exposure to catalyst were both substantial and grave, as signaled by the warnings referencing cancer. Although there have been no experts designated to testify as to the causation tying the ailments present in the Plaintiffs to Shell catalyst, neither side seems to dispute the connection. Summarily, this significant risk of grave harm makes Shell's reliance appear less reasonable.

---

[65] (Willett Dep. at 46, 48-49, 50, 52, 69.)

[66] HOVIC testimony appears to be conflicting with regards to the sanctioning of employees for failure to adhere to safety rules. (*See* Sagebien Dep. at 176, 184; Newcomb Dep. at 197:12-14).

## 6. Burden on Supplier

Finally, the sixth factor considers the severity of the burden that arises from requiring suppliers like Shell to directly warn employees. While there are conceivable situations where requiring direct warnings would be more burdensome,[67] this situation presents a heavy burden and Shell's reliance on HOVIC to convey this warning therefore seems justified. Shell argues that the constant turnover of employees and the presence of independent contractors made direct warnings sufficiently untenable because of the difficulty in identifying the workers in need of the specified warning.[68]

■ The Plaintiffs' retort is twofold; first they suggest that such a warning was feasible in the negligence context and second, they argue that such a warning was required, as a non-delegable duty under strict liability.[69] This Court is not persuaded by either claim, in light of the presumptive means for implementing such a warning: employing a representative on-site. Plaintiffs miss the point. This inquiry turns not on feasibility, but burden. This heavy burden, forcing Shell to employ a full-time hazard communicator wherever Shell's products are sold, dictates a finding that Shell's reliance may have been reasonable. Furthermore, the sophisticated intermediary defense is express situation were the duty to warn may be delegated.

■ Balancing the factors, the Court acknowledges an even split. The latent danger of the spent catalyst, the inadequacy of the warnings to communicate the dangers of spent catalyst, and the significant magnitude of the potential harm all militate in favor of requiring Shell to directly warn the workers at the refinery. The suitability of the warnings to the intended industrial use of the catalyst, the reliability of HOVIC as a conduit for the warnings and the heavy burden of directly warning end users all dictate an opposite finding. Ultimately, this test turns on the potential deficiencies of the warnings to HOVIC. For even industrial users were entitled threshold warnings concerning fundamental dangers of handling spent catalyst. Moreover, even as reliable as HOVIC may

---

[67] *See Kennedy*, 579 A.2d 1191 at 1202-03 (noting that the defendant satisfied the sixth factor because employers workplace was not accessible to supplier for direct warnings due to the protection of the employer's trade secrets).

[68] (Def. Shell Oil Co.'s Mot. for Summ. J. at 15, 16.)

[69] (Pls.' Resp. to Def. Shell Oil Co.'s Mot. For Summ. J. (II) at 25-27, 30.)

have been, it could not have relayed warnings that it was not supplied. Finally, the burden of supplying HOVIC with adequate warnings would have been significantly less than the burden of supplying all refinery workers with direct warnings. The balancing of these factors suggests that there exists a genuine, triable issue of material fact regarding the reasonableness of Shell's reliance. Shell has not established the sophisticated intermediary defense as a matter of law and thus is not entitled to summary judgment on Counts I and II,[70] should the defense even be held to apply in both negligence and strict liability settings.

## VI. CONCLUSION

In conclusion, this Court holds that title 1, section 4 mandates that absent statutory or precedential law to the contrary, courts in the Virgin Islands must apply the current common law majority rule, as expressed, first, in the Restatement in existence at the time of its enactment and second, to the extent not so expressed, as generally understood and applied in United States, with such an inquiry beginning with subsequent versions of the Restatement. Because the Restatement (First) and (Second) of Torts represent the majority rules for negligent and strict liability failure to warn causes of action, respectively, and appellate courts in this jurisdiction have adopted the RESTATEMENT (SECOND) OF TORTS division 2, chapter 14, topic 5, the Court cannot endorse subsequent restatements without a directive to do so. Applying these principles, the Court also concludes the sophisticated intermediary defense represents the majority rule. However, since there are genuine issues of material fact as to Shell's satisfaction of the requisite elements of the sophisticated intermediary defense, granting summary judgment on Counts I and II is improper at this time. Summary judgment on Counts III and IV, however will be granted in the accompanying order.

---

[70] The final issue before the Court is the determination of the applicability of the defense to strict liability failure to warn causes of action. The Court defers this inquiry for another time because Shell failed to establish the elements of the defense.